Dana Seum STEPHENSON Appellant,

v.

Virginia L. WOODWARD and David L. Williams, in His Capacities as President of the Kentucky State Senate and Official Representative of all Members of the Kentucky State Senate Appellees.

and

David L. Williams, in His Official Capacity as President of the Senate of the Commonwealth of Kentucky Appellant,

v.

Virginia L. Woodward and Dana Seum Stephenson Appellees,

and

Virginia L. Woodward Appellant,

v.

Dana Seum Stephenson and David L. Williams, in His Capacities as President of the Kentucky State Senate and Official Representative of All Members of the Kentucky State Senate Appellees.

Nos. 2005–SC–0603–TG, 2005–SC–0604–TG, 2005–SC–0645–TG.

Supreme Court of Kentucky.

Dec. 22, 2005.

As Modified Jan. 19, 2006.

James E. Milliman, Donald H. Vish, Rebecca Grady Jennings, Middleton & Reutlinger, Louisville, Counsel for Dana Seum Stephenson.

Jennifer Ann Moore, H. Philip Grossman, Fernandez, Friedman, Grossman & Kohn, Louisville, Counsel for Virginia L. Woodward.

Harland C. Hatter, Frankfort, Paul Emmanuel Salamanca, Lexington, Counsel for David L. Williams.

Douglas L. McSwain, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, Peter S. Wattson, St. Paul, MN, Counsel for Amicus Curiae, National Conference of State Legislatures.

David T. Royse, Stoll, Keenon & Park, LLP, Lexington, Steven F. Huefner, Columbus, OH, Counsel for Amicus Curiae, American Legislative Exchange Council.

JOHNSTONE, Justice.

Appellants, Dana Seum Stephenson and David L. Williams, in his official capacity as President of the Kentucky State Senate, appeal from a judgment of the Franklin Circuit Court granting summary judgment in favor of Appellee, Virginia L. Woodward, determining that Stephenson is not qualified to hold the office of State Senator for the 37th District. Woodward cross appeals that portion of the Franklin Circuit Court judgment denying her request to issue an injunction requiring the Senate to seat her as State Senator for the 37th District. For the reasons set forth herein, we affirm in part and reverse in part.

Though agreed upon by the parties, the nature of this matter and its import to the public require a detailed recitation of the facts and procedural history. Virginia L. Woodward (Woodward) and Dana Seum Stephenson (Stephenson) were candidates for the office of State Senator from the 37th District, located in Jefferson County. The general election was scheduled for November 2, 2004. The day before the election, Woodward filed a motion in the Jefferson Circuit Court to disqualify Stephenson as a candidate. The motion, filed pursuant to KRS 118.176, alleged that Stephenson failed to meet the residency requirement set forth in Section 32 of the Kentucky Constitution. It was filed at four o'clock on the afternoon of November 1, 2004.[1] A hearing on the motion was scheduled for November 3, 2004.

---

**1.** It must be noted that the record is devoid of any evidence indicating that Ms. Woodward

The general election was held on November 2, 2004, and the names of both Woodward and Stephenson appeared on the ballot. There were 22,772 votes cast for Stephenson; 21,750 votes were cast for Woodward.

The Jefferson Circuit Court held an evidentiary hearing the next day. Senator David Williams appeared by counsel at the hearing, intervening in his capacity as President of the Kentucky State Senate, to argue that the court lacked jurisdiction. The court disagreed, interpreting KRS 118.176 as authorizing the judiciary to decide pre-election challenges to candidates' qualifications. The court further issued a temporary injunction preventing the Jefferson County Board of Elections from certifying the results of the disputed election pending a final ruling on Woodward's motion.

On November 22, 2004, after considering evidence submitted at the hearing as well as additional briefing by the parties, the Jefferson Circuit Court granted Woodward's motion. Concluding that Stephenson had failed to meet the six-year residency requirement found in Section 32 of the Kentucky Constitution, the court ruled that she was not a bona fide candidate. Accordingly, the court dissolved the temporary injunction previously issued, and ordered the Jefferson County Board of Elections not to count votes cast for Stephenson. Neither Stephenson nor Senator Williams appealed this order.

Rather, on December 7, 2004, Stephenson filed an election contest in the Kentucky State Senate pursuant to KRS Chapter 120. Stephenson asserted that the Jefferson Circuit Court lacked jurisdiction to determine her qualifications for office, and requested the State Senate to seat her. In response to the election contest, Woodward filed an action in the Franklin Circuit Court on December 15, 2004. She sought declaratory and injunctive relief against Stephenson, Senator Williams, and the State Board of Elections. On December 21, 2004, Woodward further requested that Stephenson be prohibited from pursuing the election contest in the Senate. A Franklin Circuit Court Special Judge considered both motions, and on December 21 ordered the State Board of Elections to certify the votes for Woodward and to issue an election certificate despite the ongoing dispute. The court also denied Woodward's request to enjoin Stephenson from proceeding with the election contest in the Senate. On December 28, the State Board of Elections complied with this order by unanimously certifying Woodward as the winner for the 37th District State Senate seat.

On December 30, 2004, Woodward brought another motion in the Franklin Circuit Court for a temporary injunction against Stephenson. She also sought an injunction against Senator Williams that would require him to seat her as an active State Senator and to reject Stephenson's election contest. The court declined to issue either injunction due to pending motions to dismiss for lack of jurisdiction.

Meanwhile, on January 1, 2005, Jefferson Circuit Court Judge Stephen Ryan administered the oath of office for State Senator to Woodward. On January 4, 2005, Woodward again recited the oath of office for State Senate in the Kentucky State Senate chambers with other newly elected Senators. Immediately thereafter, however, Senator Dan Kelly moved to re-

purposefully withheld her motion or otherwise effectuated a "calculated late filing" as stated by Justice Scott in his dissenting opinion. Such a conclusion is nothing more than

a bare inference from the circumstances of the case; a "calculated late filing" was neither admitted by Ms. Woodward nor proven by her adversaries.

fuse recognition of the certificate of election by the State Board of Elections on the basis that Woodward had not received the most raw votes. The motion passed by voice vote. The same day, the Senate randomly selected an Election Contest Board of nine members to consider Stephenson's still-pending election contest.

Following two days of deliberations, the Senate's Election Contest Board issued reports to the full Senate. The majority report, signed by five of the nine members of the committee, determined that Stephenson's election contest was without merit because she failed to meet the six-year residency requirement of the Kentucky Constitution. The majority report further found Woodward to be the duly certified and elected winner in the 37th District. Nevertheless, on January 7, 2005, the Senate voted to reject the majority report of its Election Contest Board and instead accepted a minority report filed by three members of the Board.[2] This minority report found that Stephenson was legally qualified to be seated as a member of the Senate. Shortly thereafter, the Senate seated Stephenson as the State Senator from the 37th District and the Clerk of the Senate administered the oath of office to her.

The following week, on January 14, 2005, the Franklin Circuit Court issued a temporary injunction prohibiting Stephenson from exercising the duties of the Senate office and denying Stephenson's motion to dismiss for want of jurisdiction. On January 28, 2005, the court also denied Woodward's motion for injunctive relief against Senator Williams. Subsequently, Stephenson and Senator Williams, in his official capacity as President of the Senate, filed motions for interlocutory relief with

the Court of Appeals. This Court accepted transfer of the motions and issued an opinion on March 17, 2005, upholding the temporary injunction and declining to address the merits of the dispute.

Both parties then filed motions for summary judgment in the Franklin Circuit Court. The court issued its opinion on June 1, 2005. Though concluding that the Jefferson Circuit Court's judgment was not binding on the Senate, the Franklin Circuit Court found that the Senate's action in seating Stephenson as a Senator was arbitrary under Section 2 of the Kentucky Constitution. Accordingly, the court partially granted Woodward's motion for summary judgment by declaring Stephenson a constitutionally unqualified candidate and therefore ineligible to be seated as a Senator. However, the court declined Woodward's request to require that Senator Williams seat Woodward as Senator, concluding that the court lacked authority for such action.

Stephenson and Senator Williams appealed the judgment of the Franklin Circuit Court to the Court of Appeals. This Court accepted transfer of the case on August 31, 2005, and heard oral arguments by the parties on November 16, 2005. On appeal, the gravamen of Stephenson's and Senator Williams' arguments is that this Court lacks jurisdiction to hear this action. Both Appellants argue that Section 38 of the Kentucky Constitution grants the General Assembly exclusive and ultimate power to judge the qualifications of its members. They maintain that Section 2 of the Kentucky Constitution does not permit the judiciary to review the General Assembly's exercise of power pursuant to Section 38 and, therefore, the Franklin Circuit Court

___

**2.** The remaining member of the Board also filed a report finding Stephenson to be unqualified. However, this member believed a special election should be held to fill the vacancy.

erred in holding that the Senate acted arbitrarily in seating Stephenson as State Senator. Woodward responds with two central arguments. First, Woodward maintains that Section 2 of the Kentucky Constitution authorizes this Court to review the Senate's exercise of power for arbitrariness. For this reason, according to Woodward, the judgment of the Franklin Circuit Court was correct. Furthermore, Woodward posits that the judgment of the Jefferson Circuit Court, finding Stephenson to be an unqualified candidate for State Senator, is binding on all parties and serves to prevent Stephenson from being seated as a State Senator.

■ Because we conclude that it is determinative of the matter, we first address the action of the Jefferson Circuit Court. The Jefferson Circuit Court predicated its jurisdiction to hear Woodward's motion on KRS 118.176. On appeal, the parties dispute the extent of jurisdiction authorized by the statute, which provides a procedure and remedy for pre-election challenges to the qualifications of a candidate. "The courts of this Commonwealth have long recognized that the judicial branch has no inherent power to pass on the validity of elections or the eligibility of candidates, but only has such power as given by the General Assembly or possessed at common law through a *quo warranto* proceeding." *Noble v. Meagher,* 686 S.W.2d 458, 460 (Ky.1985) (construing prior version of KRS 118.176). But, the General Assembly has, in fact, done precisely what it is authorized to do by enacting KRS 118.176—it has delegated to the courts the sole authority to judge the qualifications of candidates if a challenge is filed prior to an election. It is important to note that no party to this action has challenged the constitutionality or validity of this statute.

Nonetheless, Senator Williams and Stephenson invoke the authority of the General Assembly to judge the qualifications of its members pursuant to Section 38 of the Kentucky Constitution, which states that "[e]ach house of the General Assembly shall judge of the qualifications, elections and returns of its members, but a contested election shall be determined in such manner as shall be directed by law." KRS 120.195 and KRS 120.215 carry out the command of Section 38, and direct the procedures for contesting an election for a position in the General Assembly; the statutes do not include the judiciary in this process. Yet, again, neither this Court nor the courts below predicate our jurisdiction to hear this matter on KRS Chapter 120 or Section 38 of the Constitution. Rather, the General Assembly has specifically conferred jurisdiction upon the courts to adjudicate challenges questioning the qualifications of candidates through KRS 118.176.

■ Furthermore, contrary to that espoused in the dissenting opinions, the delegation of authority in KRS 118.176 in no way infringes upon the constitutional authority of the General Assembly to judge the qualifications of its members pursuant to Section 38. Stephenson's and Williams' arguments are predicated upon the fundamentally flawed belief that Stephenson was actually a *member* of the Senate. In a normal election that proceeds without dispute or controversy, candidates are no longer candidates after the election has occurred, as the voters have designated a winner who then becomes a Senator-elect. However, the mere happening of the election does not instantly transform this Senator-elect into a sitting member of the Senate. Rather, a Senator-elect only becomes a member of the Senate when his or her term commences "upon the first day of January of the year succeeding [the] election." Ky. Const. Sec. 30. This proscription exists for an obvious reason: so that

the terms of the departing Senator and the Senator-elect do not overlap.

Here, though, when the Jefferson Circuit Court rendered its order finding that Stephenson was not a bona fide candidate and therefore ineligible to appear on the ballot, she lost all rights to that office. This determination was made on November 22, 2004—before Stephenson had taken the oath of office, before she had been sworn in as a State Senator, and before the term of office which she sought commenced on January 1, 2005. There is simply no legal or logical authority for the proposition that Stephenson was a member of the Senate when the Jefferson Circuit Court rendered its decision, a point conceded by all parties. Because she was not a member, the Jefferson Circuit Court's order in no manner violated Section 38 of the Kentucky Constitution. It is also for this reason that Appellants', as well as the dissenting opinions', reliance on cases dealing with this Court's refusal to interfere with the General Assembly's exclusive authority to pass on the qualifications of its *members* is clearly misplaced. *See e.g. Raney v. Stovall*, 361 S.W.2d 518 (Ky.1962) (dealing with the qualifications of a sitting member of the Senate who was appointed as a deputy sheriff halfway through his term).

■ We also reiterate the long-observed principle that constitutional adjudication should be avoided unless it is strictly necessary for a decision in the case. In *Spector Motor Service v. McLaughlin*, the Supreme Court of the United States stated, "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). More recently, in *Gomez v. U.S.*, the Court stated, "It is our

settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989). One articulation of the rule directly applicable here was first stated by Justice Brandeis: "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). As the General Assembly adopted KRS 118.176 and it applies to this case, we will confine our analysis to the statute.

■ Necessary to this determination is our conclusion that this matter does not involve an election contest. "An election contest obviously is a post-election procedure, involving an election that has been held, as distinguished from a pre-election suit to determine whether a person may be voted on as a candidate." *Fletcher v. Wilson*, 495 S.W.2d 787, 791 (Ky.1973). Furthermore, this Court has specifically determined that pre-election challenges pursuant to KRS 118.176 are not election contests. *Noble v. Meagher*, 686 S.W.2d 458, 461 (Ky.1985). Cases dealing with election contests—that is, disputes involving not the qualifications of a candidate but the validity of the election itself—are inapplicable to this matter. *See e.g. Taylor v. Beckham*, 108 Ky. 278, 56 S.W. 177 (1900) (in which the Court refused to interfere with the General Assembly's constitutional authority to settle a contested election, wherein fraud and corrupt practices were alleged). Thus, the Jefferson Circuit Court had jurisdiction, expressly granted by the General Assembly pursuant to KRS 118.176, to accept Woodward's motion as such action was not an election contest,

but rather a challenge to a candidate's qualifications to appear on the ballot.

■ We next address two subordinate issues: whether KRS 118.176 authorized the Jefferson Circuit Court to hear arguments on Woodward's motion the day after the general election, and whether it had jurisdiction to grant relief to Woodward in the form of an injunction. At the outset, we reiterate that statutes governing election procedures must be strictly complied with because "compliance with certain statutory steps are jurisdictional requirements." *Noble* at 460. *See also Ritchie v. Mann*, 500 S.W.2d 62 (Ky.1973). Subsection 2 of KRS 118.176 sets forth certain time limitations for filing a motion to challenge a candidate's qualifications, and reads in pertinent part:

> The bona fides of any candidate seeking nomination or election in a primary or general election may be questioned by any qualified voter entitled to vote for such candidate or by an opposing candidate by summary proceedings consisting of a motion before the Circuit Court of the judicial circuit in which the candidate whose bona fides is questioned resides. An action regarding the bona fides of a candidate seeking nomination or election in a primary or general election may be commenced at any time prior to the general election. The motion shall be tried summarily and without delay.

Stephenson argues that the Jefferson Circuit Court lacked jurisdiction to hear Woodward's motion to disqualify her and, consequently, lacked jurisdiction to enjoin the Jefferson County Board of Elections from counting votes cast for her. According to Stephenson, KRS 118.176 grants authority to a circuit court to consider pre-election challenges only up until the time of the election, but that its jurisdiction evaporates once the polls have opened. At that time, jurisdiction then shifts to the General Assembly by virtue of Section 38 of the Kentucky Constitution. Furthermore, because the polls had closed and all votes had been cast prior to the time of the Jefferson Circuit Court order, Stephenson posits that the action was moot. Stephenson therefore concludes that the judgment of the Jefferson Circuit Court is void.

Woodward relies primarily on the plain language of the statute, which does not explicitly state that a challenge to the bona fides of a candidate must be commenced *and* adjudicated prior to the election. Furthermore, Woodward directs our attention to KRS 118.176(4), which sets forth an expedited appeal process for motions brought under the statute: "[t]he motion shall be heard by the Court of Appeals . . . except that the motion must be made before the court or judge within five (5) days after the entry of the order in the Circuit Court." Woodward argues that this language clearly contemplates an appeal process that may extend beyond the election. Thus, Woodward argues that the Jefferson Circuit Court properly exercised its jurisdiction and its order is valid and becomes binding in the absence of an appeal therefrom.

■ We turn to the proper interpretation of KRS 118.176. "It was long ago settled that the interpretation of statutes is a proper judicial function." *Masonic Widows and Orphans Home and Infirmary v. City of Louisville*, 309 Ky. 532, 217 S.W.2d 815, 822 (1948). When construing duly enacted statutes, it is "the seminal duty of a court . . . to effectuate the intent of the legislature." *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky.2002). *See also Wesley v. Bd. of Educ. of Nicholas County*, 403 S.W.2d 28, 29 (Ky.1966) (the "fundamental touchstone" of statutory construction is "the will or intent of the legislature"). The most logical and effective

manner by which to determine the intent of the legislature is simply to analyze the plain meaning of the statutory language: "[r]esort must be had first to the words, which are decisive if they are clear." *Gateway Constr. Co. v. Wallbaum,* 356 S.W.2d 247, 249 (Ky.1962). "[S]tatutes must be given their literal interpretation unless they are ambiguous and if the words are not ambiguous, no statutory construction is required." *Plowman* at 49. We lend words of a statute their normal, ordinary, everyday meaning. *Id.*

KRS 118.176 provides that an action challenging the bona fides of a candidate in a general election "may be commenced at any time prior to the general election." This language is clear and free of any ambiguity or uncertainty. The terminology used in the statute is of common parlance. The statute employs the very broad and expansive language that the action may be commenced at *any time* prior to the general election. Contrary to Justice Scott's definition, it places no restrictions as to exactly how far in advance of the general election the motion may be filed, nor does it identify a deadline other than "the general election." We need not resort to speculation or conjecture to discern the legislative intent of this portion of KRS 118.176: the only logical interpretation is that it authorizes challenges up to the time that the general election commences. "A civil action is commenced by the filing of a complaint with the court and the issuance of a summons or warning order thereon in good faith." CR 3.01. It is uncontested that Woodward commenced her action in the Jefferson Circuit Court as defined by CR 3.01, and fulfilled the time requirement of KRS 118.176, as she filed her motion before the election commenced the following day.

Stephenson directs our attention to the fact that the Jefferson Circuit Court did not hold a hearing on the motion or render its decision until after the November 2 general election. She urges that the jurisdiction of the circuit courts to consider KRS 118.176 motions extinguishes, or evaporates, when the polls open and the election has commenced. Implicit in this argument is the concession that the Jefferson Circuit Court did have jurisdiction when Woodward's motion was filed. Jurisdiction turns on the facts existing at the time the action was commenced. *Louisville, N.A. & C. Ry. Co. v. Louisville Trust Co.,* 174 U.S. 552, 556, 19 S.Ct. 817, 818, 43 L.Ed. 1081 (1899). "As a general rule, jurisdiction once acquired is not defeated by subsequent events, even though they are of such character as would have prevented jurisdiction from attaching in the first instance." 21 C.J.S. *Courts* § 72 (2005). *See also Big Sandy Realty Co. v. Stansifer,* 253 S.W.2d 601, 604 (Ky.1952) (same, quoting a prior version of 21 C.J.S. *Courts, supra* ). Therefore, the Jefferson Circuit Court, having acquired jurisdiction by the timely filing of Woodward's motion pursuant to KRS 118.176, retained that jurisdiction to finally adjudicate the action despite the subsequent general election, even though it would not have acquired jurisdiction had Woodward filed her motion after the commencement of the election.

Furthermore, Stephenson's position is at variance with the language of the statute. Under Stephenson's interpretation, simply filing an action prior to the election is insufficient because the issue becomes moot and non-justiciable once the election has been held. In other words, Stephenson argues that KRS 118.176 requires that the action be commenced *and adjudicated* prior to the election. This interpretation, however, is in direct contravention of the plain language of the statute, which states only that the action must

be commenced prior to the election. It does not require that the action must be commenced and adjudicated prior to the election. We decline the invitation to attach additional words or meaning to an otherwise clear and unambiguous statute. "We are not at liberty to add or subtract from the legislative enactment or discover meaning not reasonably ascertainable from the language used." *Commonwealth v. Harrelson*, 14 S.W.3d 541, 546 (Ky.2000).

Nor may we interpret a statute at variance with its stated language. There is no language in KRS 118.176 from which to deduce that the General Assembly intended these actions be adjudicated prior to the opening of the polls. In fact, the sole reference to the circuit court's time limitations is the requirement that the motion be "tried summarily and without delay." Reading this provision in concert with the expedited appeal process set forth in subsection 4 of the statute makes it clear that the legislature considered the exigency of KRS 118.176 motions. The public's interest in the expeditious resolution of election challenges is axiomatic. However, the legislature specifically provided that the motion be considered without delay; it did not state that the motion must be adjudicated prior to the election. Principles of statutory interpretation lead to a single conclusion: if the legislature had intended that actions pursuant to KRS 118.176 be both commenced and adjudicated prior to the general election, it would have so stated in definitive terms.

Additionally, Stephenson argues that, because the statute does not provide for a remedy post-election, the legislature did not intend for the courts to further consider such actions after the election had been held, even if they had been commenced prior to the election. Again, this assertion ignores the clear and unambiguous language of the statute. When a circuit court has determined that a candidate is not a bona fide candidate, KRS 118.176(4) mandates that the court must "certify the fact to the board of elections, and the candidate's name shall be stricken from the written designation of election officers filed with the board of elections *or the court may refuse recognition or relief in a mandatory or injunctive way.*" (Emphasis added). We agree with Stephenson's common sense conclusion that striking a candidate's name from the ballot is a pre-election remedy. However, we cannot conclude that this language precludes any post-election remedy. To the contrary, by employing the phrase "or the court may refuse recognition or relief in a mandatory or injunctive way," the legislature explicitly authorizes additional forms of relief. To adopt Stephenson's reasoning would render the last portion of the sentence utterly meaningless. The plain and unambiguous language of the statute permits a circuit court to do precisely what the Jefferson Circuit Court did, in fact, do. By enjoining the Jefferson County Board of Elections from counting votes cast for Stephenson, the court refused recognition of Stephenson as a candidate by means of an injunction, which is expressly authorized by the statute.

Finally, we note that Stephenson's theory of "evaporating jurisdiction" would lead to curious results, surely not intended by the General Assembly. Both Stephenson and Williams concede that KRS 118.176 actions may be brought any time prior to the election; this is unequivocally stated in the statute. However, if a court may accept these actions any time prior to the election, but loses jurisdiction once the polls open, there is nothing to prevent a recalcitrant judge from simply refusing to

adjudicate a KRS 118.176 motion.[3] The court might simply let the motion sit until after election day, at which point jurisdiction would evaporate. We are confident that the General Assembly did not intend such a result, but instead intended the judiciary to adjudicate the qualifications of candidates—even if, in rare circumstances, such adjudication actually occurs several days after the election has occurred. Furthermore, this interpretation in no way encourages the "calculated late filings" feared by Justice Scott. If jurisdiction to adjudicate the matter does, in fact, continue beyond the election, then candidates have no incentive to file their actions later rather than sooner. Rather, it inures to their benefit to disqualify an adversary as early as possible, saving the time, effort and expense of additional campaigning against an unqualified candidate who could never lawfully take office.

 Because the language of the statute is abundantly clear, we need not resort to extrinsic aids to its interpretation. Nonetheless, the legislative history is enlightening and serves only to strengthen our foregoing conclusion, and for this reason we reference it.[4] KRS 118.176 has existed in several forms since 1974, but was amended most recently in 2001. Prior to the 2001 version, KRS 118.176 allowed challenges to the bona fides of a candidate only up until the time of the primary election. *See Noble v. Meagher*, 686 S.W.2d 458 (Ky.1985) (holding, in part, that the post–1984 version of KRS 118.176 requires that challenges to the qualifications of a candidate must be made before the primary election in strict compliance with the wording of the statute). The General Assembly again considered the statute in 2001 in response to the case of *Legate v. Stone*.[5]

There, Legate and Stone were candidates for councilperson in Madisonville, Kentucky. Though running in the primary election as a Democrat candidate, it was discovered on the day of the primary election that Legate was, in fact, a registered Republican. Legate received the most raw votes in the election. After the primary election, Stone filed a challenge pursuant to KRS 118.176 to disqualify Legate, and the circuit court ruled in his favor. The Court of Appeals, however, reversed with directions to dismiss the action, concluding that KRS 118.176 motions filed after the primary election are untimely. This Court denied discretionary review.

At the next legislative session in 2001, the General Assembly amended the statute to allow challenges to a candidate's qualifications up until the general election. The

---

3. This is not the situation that occurred in the Jefferson Circuit Court. While the court did postpone the hearing on Woodward's motion, a delay of less than 48 hours can hardly be considered a "worst case scenario," as characterized by Justice Roach.

4. "In the interpretation of statutes, the function of this or any court is to construe the language so as to give effect to the intent of the legislature. There is no invariable rule for the discovery of that intention. The actual words used are important but often insufficient. The report of the legislative committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing. Words spoken in debate may be looked at to determine the intent of the legislature." *Fiscal Court of Jefferson County v. City of Louisville*, 559 S.W.2d 478, 480 (Ky.1977).

5. The opinion of the Court of Appeals in this matter was not designated for publication. It may be referenced by its case number, 2000–CA–01724–I. We note also that this case is not cited as authority, as prohibited by CR 76.28(4)(c), but rather simply to acknowledge the impetus for the 2001 legislative revision to KRS 118.176.

stated purpose of the proposed amendment was to allow challenges up until the time of the general election, specifically to prevent the situation that ultimately occurred in *Legate v. Stone*.[6] The Journal of the House of Representatives indicates that an initial version of the amendment proposed that an "action regarding the bona fides of any candidate seeking nomination or election in a primary or general election may be commenced either before or after the primary or general election."[7] The version ultimately enacted, of course, allows KRS 118.176 actions simply "any time prior to the general election," effectively prohibiting motions subsequent to the general election. Comments made by Representatives during a session of the House Committee on Elections, Constitutional Amendments and Intergovernmental Affairs indicate that this alteration was made because, after an election, "candidates" are no longer "candidates" and therefore are not the subject of KRS 118.176 actions. From this history, we believe that it is unquestionable that the General Assembly amended KRS 118.176 in 2001 to effectuate a singular goal: to allow challenges to a candidate's qualifications after the primary election and *any time prior to the general election.*

Finding no ambiguity in the plain language of the statute, it is our holding that KRS 118.176 permits a circuit court to consider and adjudicate challenges to a candidate's bona fides that are commenced prior to the general election. There are no limitations placed on the movant as to how far in advance of the election the action may be commenced, nor are there limitations placed on the circuit court concerning time limitations for adjudication. Here, Woodward commenced her action

prior to the general election. That she filed the motion to disqualify Stephenson hours before the polls opened is of absolutely no consequence; her action was commenced prior to the election and satisfies this simple requirement of the statute. Furthermore, because Woodward's motion complied with the filing requirements of the statute, the Jefferson Circuit Court had jurisdiction to adjudicate the matter and grant relief in the form of an injunction, and that jurisdiction continued to exist even after the election had occurred. Because no party to this action chose to appeal the order of the Jefferson Circuit Court, it is valid and binding on the parties. Though for substantively different reasons, we affirm that portion of the Franklin Circuit Court judgment declaring that Stephenson is not constitutionally qualified for the office of State Senator and may not be seated.

We must also consider Woodward's cross-appeal in which she argues that the Franklin Circuit Court erred in declining to compel Senator Williams to seat her as the Senator for the 37th District. Kentucky courts have long recognized the principle that votes cast for an unqualified candidate are not in and of themselves void. Stephenson did, in fact, receive the most votes in this election. However, the fact that she has been disqualified does not render Woodward the winner nor grant her a right to the office. Rather, the effect of the disqualification of a candidate subsequent to the election is that no election has occurred and the true and legitimate will of the people has not yet been expressed. *See Woods v. Mills,* 503 S.W.2d 706 (Ky.1974) (declining to declare the appellant the winner in an election in which the appellee, who won the

---

6. *Hearing on HB 85 Before the Sen. State and Local Gov't. Comm.,* 2001 Reg. Sess. (Ky. 2001).

7. Ky. H.J. Reg. Sess. (2001).

most votes, was later disqualified). *See also Bogie v. Hill*, 286 Ky. 732, 151 S.W.2d 765 (1941); *McKinney v. Barker*, 180 Ky. 526, 203 S.W. 303 (1918). We therefore affirm that portion of the Franklin Circuit Court judgment denying Woodward's request to compel the Senate to seat her.

This Court is deeply respectful of the electoral process and its very fundamental role in the functioning of a true democracy. We are equally sympathetic to those citizens who voted in the election herein disputed. However, we cannot ignore that an election may only be considered legitimate when the statutory procedures governing the process are followed and constitutional mandates are respected. When a candidate who is constitutionally unqualified to take office nonetheless presents him or herself as a qualified candidate eligible for election and office, that candidate has not only misled the electorate but also engaged it in a futile endeavor. Votes cast for the unqualified candidate lack the import of those cast for a qualified candidate, as each vote could under no circumstances result in the placement of the candidate in the desired office. As stated above, though the voters of the 37th District participated in the election process on November 2, 2004, they were essentially prevented from making a choice and the end result is that no valid election has actually occurred.

Unfortunately, the 37th District has been unrepresented for nearly an entire year during the pendency of this action. Sadly, the delay was avoidable. Had the Appellants sought relief from the Jefferson Circuit Court order through the appellate process, rather than abandoning judicial remedy and instead seeking a more favorable outcome in an alternate forum, this matter could have been expeditiously resolved and the 37th District would have had the representation to which it is entitled. Instead, the protracted nature of this widely publicized litigation provided fertile ground for tensions to rise and arguments to become more heated between the parties. The result is that a single challenge to the qualifications of a candidate has mushroomed into a perceived clash of a constitutional magnitude between the legislature and the judiciary. The constitutional confrontation between separate branches of Kentucky's government which was predicted by some has not arisen.

While Justice Roach might find it "mind-boggling" and "outrageous" that we have decided the issues herein presented, it would be even more outrageous for this Court to abandon its Constitutional duty to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). This Court and its predecessors have recognized on countless occasions the autonomy of our sister branches of government, our inability to pass on the wisdom of legislative or gubernatorial action, and our profound respect for the doctrine of separation of powers. But, just as this Court will not infringe upon the independence of the legislature, we will not cast a blind eye to our own duty to interpret the Constitution and declare the law. It is the primary and fundamental responsibility of this Court to ensure that the Constitution of this Commonwealth is respected. As we have set forth at length in this opinion, the legislature has delegated authority to the judiciary to determine the qualifications of a candidate for public office; that alone is the issue to which we have confined our decision. By exercising only that jurisdiction that has been specifically conferred upon the judiciary by the legislature, this Court has neither infringed on the autonomy of the General Assembly nor violated the doctrine of separation of powers.

For the foregoing reasons, the judgment of the Franklin Circuit Court is affirmed in part and reversed in part.

LAMBERT, C.J.; GRAVES and WINTERSHEIMER, JJ., concur.

LAMBERT, C.J., files a separate concurring opinion, which GRAVES, J., joins.

COOPER, J., concurs in part and dissents in part, by separate opinion.

ROACH, J., dissents by separate opinion, with SCOTT, J., joining.

SCOTT, J., dissents by separate opinion.

LAMBERT, Concurring Chief Justice.

My colleagues, Justice Johnstone, Justice Cooper, Justice Scott, and Justice Roach, have each written an opinion in this case. Without any doubt, all of their opinions are the product of superb scholarship, deep respect for constitutional principles, and personal integrity in the decision-making process. In the end, by a vote of 5–2, this Court has determined that the decision of the Franklin Circuit Court denying Dana Seum Stephenson a seat in the Kentucky Senate should be affirmed. While some will disagree with the outcome, there should be no doubt that every relevant argument has been honestly considered by the seven fallible human beings who sit on the Supreme Court of Kentucky

A guiding principle of American law was given to us by "the great Chief Justice"[1] John Marshall in *Marbury v. Madison.*[2] During the infancy of this nation, Chief Justice Marshall set us on a course from which no political body or institution has seriously deviated for more than two hun-

dred years. Only the words of Chief Justice Marshall are adequate as an exposition of this organic principle:

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.... This is of the very essence of judicial duty.[3]

The Supreme Court of Kentucky is the final arbiter of Kentucky constitutional law.[4]

We have now done our "judicial duty" and the duty to go forward with the process of government is upon others. Responsible officials will reject any notion of defiance or retaliation against the judiciary, for such action would be an attack upon the Constitution itself. Judges, legislators, and governors come and go, but the Constitution remains. Public officials must honor conclusive constitutional interpretation regardless of the depth of their disagreement with a particular decision, for anything else would fundamentally alter the constitutional allocation of governmental responsibility.

Most Kentuckians will not understand the esoteric concepts herein debated in this Court's opinions. Justiciability, textual commitment, stare decisis, and other legal terms of art will not be generally understood, but persons with even a casual interest in public affairs will understand that the rule of law must be observed. Our national tradition compels such observance even in the most divisive of legal contro-

---

1. *Heart of Atlanta Motel, Inc. v. U.S.,* 379 U.S. 241, 254, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

2. 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

3. *Id.* at 177.

4. *See* Ky. Const. § 109.

versies. Illustrative of this, the President of the United States yielded upon a determination by the Supreme Court that the Oval Office tape recordings of presidential conversations had to be surrendered to the special prosecutor.[5] With full knowledge that such tape recordings would likely lead to his impeachment, President Nixon surrendered the tapes. More recently, despite a widely held view that the Supreme Court of the United States had exceeded its jurisdiction in halting the recounting of votes in Florida, thus assuring the election of President Bush,[6] Vice President Gore, out of respect for the Court's 5–4 opinion, conceded the election.

As divisive as this controversy has been, the legal and constitutional process has been honored.

GRAVES, J., joins this concurring opinion.

COOPER, Justice, Concurring in Part and Dissenting in Part.

I concur in the majority opinion insofar as it holds that the unappealed final judgment of the Jefferson Circuit Court declaring Stephenson constitutionally unqualified to hold the office of State Senator for the 37th District is conclusive of the issue. However, for that same reason, I conclude that the Franklin Circuit Court erred in not declaring Woodward the winner of the election and ordering (if necessary) that she be seated as the State Senator for the 37th District. Therefore, I respectfully dissent from the majority opinion insofar as it affirms the Franklin Circuit Court's refusal to grant Woodward the full relief to which she is entitled.

The Jefferson Circuit Court acquired jurisdiction to determine Stephenson's bona fides as a candidate for the State Senate when Woodward commenced her action "prior to the general election" as authorized by KRS 118.176(2). As noted in the majority opinion, the intervention of the election before judgment did not divest the Jefferson Circuit Court of that jurisdiction even though that court could not have acquired jurisdiction had the action been commenced after the election. That court's order of November 22, 2004, not only declared Stephenson constitutionally unqualified for the office of State Senator, it also ordered the Board of Elections not to count any votes cast for Stephenson. Both aspects of the order became final and binding on the parties upon the expiration of the time for appeal.

The initial tally published by the State Board of Elections (and accurately described by the Board as "unofficial") reported that Stephenson received 22,772 votes and Woodward 21,750. However, the "Official Count and Record of Election Totals" subsequently certified to the Secretary of State by the Jefferson County Board of Elections reported 21,750 votes for Woodward and did not report any votes for Stephenson—instead accurately reporting that votes cast for her were "suppressed by Court Order." Thus, when the State Board of Elections conducted its official count pursuant to KRS 118.425(4), it had before it all of the votes from the 37th District that were cast for a bona fide candidate, i.e., the votes cast for Woodward. *Ipso facto*, Woodward won the election by a vote of 21,750 – 0. The State Board of Elections has certified that Woodward "received the highest number of votes given for that office, as certified to the Secretary of State, and is, therefore, duly and regularly elected for the term prescribed by the Constitution." Upon the

---

**5.** *U.S. v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

**6.** *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

expiration of the previous term of office and upon taking the oath of office, Woodward became the State Senator for the 37th District. The Senate, however, by voice vote, purported to refuse to seat her as a member of that body.

No one claims that Woodward does not possess the constitutional qualifications to hold the office of State Senator. Nothing in the Constitution gives the State Senate the power to exclude a member who has been properly certified as duly elected (election contests are outside the purview of Section 38), who has taken the oath of office, and who possesses the constitutional qualifications for the office. *See Powell v. McCormack*, 395 U.S. 486, 550, 89 S.Ct. 1944, 1979, 23 L.Ed.2d 491 (1969) ("[S]ince Adam Clayton Powell, Jr., was duly elected by the voters ... and was not ineligible to serve under any provision of the Constitution, the House was without power to exclude him from its membership."); *Mundo–Rios v. Vizcarrondo–Irizarry*, 228 F.Supp.2d 18, 30 (D.P.R.2002) ("The Legislature cannot refuse to seat an elected member, who has been provided an electoral certification of election, even if there are irregularities alleged in the election ....").

Although Section 39 of the Kentucky Constitution permits a House of the General Assembly to expel a member by a concurrence of two-thirds of its membership, that did not occur here, as there was no vote count on the motion to exclude (expel?) Woodward. (Nor would it seem that Section 2 of our Constitution would allow even two-thirds of the members of a House to expel a duly elected and qualified member without cause, *e.g.*, for purely partisan reasons.)

The three cases cited by the majority opinion for the proposition that disqualification of the candidate who received the most votes does not result in victory for the defeated candidate are not on point. In each of those cases, the disqualified candidate's votes were counted and he was certified as the winner of the election. The disqualification occurred as a result of an election contest filed *after* the election. *Woods v. Mills*, 503 S.W.2d 706, 706 (Ky.1974); *Bogie v. Hill*, 286 Ky. 732, 151 S.W.2d 765, 766 (1941); *McKinney v. Barker*, 180 Ky. 526, 203 S.W. 303, 303 (1918). Here, Woodward did not file an election contest after the election; she filed a challenge to Stephenson's bona fides before the election, and the "unofficial" votes for Stephenson were never officially reported or counted. Thus, the result is the same as if Woodward ran unopposed. The case of *Fletcher v. Wilson*, 495 S.W.2d 787 (Ky.1973), cited by Stephenson in her brief, cites cases in *dictum* that hold that a defeated primary candidate cannot challenge the winner's qualifications for office. *Id.* at 792. "These cases established the policy that questions of the kind stated above must be raised before the primary." *Id.* Of course, those cases have no application here because Woodward filed her action challenging Stephenson's bona fides before the election.

The U.S. Supreme Court was not required in *Powell* to determine whether the inherent judicial power of mandamus would be appropriate to force legislative compliance with court orders, because the only relief sought by Powell was a declaration of rights. 395 U.S. at 517, 89 S.Ct. at 1962. However, in *Noble v. Union River Logging Railroad Co.*, 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893), the U.S. Supreme Court distinguished between enjoining discretionary and ministerial governmental duties.

If he has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a manda-

mus if he refused to do an act which the law plainly required him to do.... [W]hen a plain, official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it.

*Id.* at 172, 13 S.Ct. at 273 (citation and quotation omitted).

Since the State Senate has no constitutional authority to exclude from its membership a person who has been certified as duly elected to membership and who possesses the constitutional qualifications for office, an injunction could issue to prevent that person's exclusion from membership without violating the doctrine of separation of powers. *Cf. Akers v. Floyd County Fiscal Ct.,* 556 S.W.2d 146, 149 (Ky.1977) ("Injunctive processes of law are available to be invoked in an action challenging the constitutionality of a legislative act and of the carrying out or enforcement of its provisions."); *compare Geveden v. Commonwealth,* 142 S.W.3d 170, 172 (Ky.App.2004) (doctrine of separation of powers precluded issuance of injunction to require Governor to perform purely discretionary act). I am confident, however, that the State Senate would not refuse to follow a final decision of this Court on an issue that the General Assembly specifically delegated to the judiciary by enacting KRS 118.176(2).

Accordingly, I dissent from the majority opinion insofar as it denies Woodward the full relief to which she is entitled, *i.e.,* to be declared the duly elected and qualified State Senator for the 37th District.

ROACH, Dissenting Justice.

Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control for *the judge* would then be *the legislator.*

*The Federalist* No. 47, at 376 (J. Madison) (J. Hamilton ed. 1869) (quoting Montesquieu).

No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Kentucky Constitution § 28.

Each House of the General Assembly shall judge of the qualifications, elections and returns of its members, but a contested election shall be determined in such manner as shall be directed by law.

Kentucky Constitution § 38.

This case does not concern whether Dana Seum Stephenson is a resident of Kentucky or who should serve as the Senator from the 37th District. Instead, it presents only the issue of whether the courts may interfere with the General Assembly's power to decide the elections, returns, and qualifications of its members under Section 38 of the Kentucky Constitution. The plain words and historical meaning of Section 38 are clear: The courts of this Commonwealth have no right to interfere with a decision of a house of the General Assembly concerning the qualifications, elections, and returns of its members. Since the majority opinion ignores this precept, thereby violating the Kentucky Constitution and years of this Court's precedent, I respectfully dissent.

Our predecessor court was faced with a similar question in *Taylor v. Beckham,* 108 Ky. 278, 56 S.W. 177 (1900), over the seating of the governor and the lieutenant governor following the election of 1899.

The Court courageously refused to override the constitutionally mandated requirement of separation of powers, Ky. Const. §§ 27, 28, and thereby allowed the General Assembly to exercise the powers expressly delegated to it. What is particularly noteworthy is that the Court chose to defer to the General Assembly's decision even though the underlying facts giving rise to the controversy were simply outrageous. A brief understanding of those facts is important to truly understand the significance of *Taylor v. Beckham.*

The 1899 election for governor pitted the Republican Attorney General, William S. Taylor, against Democrat State Senator, William Goebel. Dr. Clark described the ferment that began as the Election Day ended:

> When the ballots were cast, the people waited calmly for the announcement of the results. First unofficial returns indicated that Goebel and Taylor were in a neck-and-neck race for the election. The final official count gave Taylor a majority, and this was the signal for the Democrats to start challenging votes. It was claimed that Governor Bradley's troops had prevented an honest election in Louisville. Most outrageous of all, however, was the fact that by political chicanery or "oversight," votes of many eastern Republican counties were registered upon "tissue paper" ballots, which, it was claimed, were not printed on legal weight paper. This charge, a fine piece of Kentucky political chicanery, was trumped up to throw out the election.

Thomas D. Clark, *A History of Kentucky* 439 (1988).

At that point the matter was turned over to the state election board, over which Goebel was supposed to have absolute control. *Id.* at 440.* One week before inauguration day, the board declared by a 2–1 vote that Taylor had defeated Goebel by over 2,000 votes. *Id.* The election of 1899 seemed to be over, and Taylor was inaugurated. However, a Goebel Democrat filed a protest with the General Assembly, alleging that Taylor had benefited from the "corrupt use of funds." *Id.* The General Assembly selected a joint committee, dominated by Democrats, to address the claims. On January 30, 1900, while the committee was still deliberating, Goebel was shot as he was approaching the Capitol building.

Governor Taylor declared the Commonwealth in a state of insurrection and ordered the General Assembly to meet in London. The state militia refused to allow the General Assembly members into the Capitol building. *Id.* at 441. The "Democratic legislators refused to recognize the legality of [Taylor's] actions ...." Lowell H. Harrison and James C. Klotter, *A New History of Kentucky* 272 (1997) [hereinafter Harrison and Klotter, *A New History* ]. They subsequently met in secret at a hotel in Frankfort, where, without a Republican legislator present, "they accepted the contest committee's report regarding the disputed election, threw out enough votes to reverse the results, and on January 31, 1900, declared Goebel governor." *Id.* Historian James Klotter has described the meeting in even more sinister language:

> Determined Democrats denied that any state of insurrection existed. The only danger came from Republicans, they insisted. To adopt the committee

---

* This election board had been created in 1898 as a part of the Goebel Election Law. Thomas D. Clark, *A History of Kentucky* 436 (1988). "Senator Goebel virtually had the Kentucky electorate in his power, since he was entrusted, as a reward for his activities, with the selection of the first state board of election." *Id.* One Democratic paper denounced the legislation as a "piece of Goebel machination." *Id.*

report required a joint session, yet no public building large enough could be obtained because of the soldiers. But Goebel must be declared governor and Taylor must be ousted.

Later in the afternoon word came privately to each Democratic member to meet in the Capitol Hotel that evening. The instructions asked them to assemble separately, not in groups, and then to come one by one to a second floor room. A legislator present at the time recalled how "the lights at the meeting were dimmed and the proceedings carried in a low tone of voice." A quorum of nineteen senate Democrats and fifty-three from the house was announced as present, though those attending were not certain of the numbers. The group then heard the joint committee report, adopted it unanimously, and declared William Goebel the rightful governor. It had been less than thirty-six hours since he was shot.

James C. Klotter, *William Goebel: The Politics of Wrath* 104 (1977).

Goebel was sworn in as governor and died a few days later. His lieutenant governor, J.C.W. Beckham, then took the reins. Harrison and Klotter, *A New History* 273. Kentucky then appeared to have two competing governments, and the matter went to the courts. Though the resulting case, *Taylor v. Beckham,* 108 Ky. 278, 56 S.W. 177 (1900), will be discussed at length below, I note that our predecessor court faithfully followed the Constitution of Kentucky and allowed the General Assembly's decision to stand, even though it had been made in secret and without the benefit of the attendance of any member from the minority party, and was, by all accounts, in complete defiance of the facts. Ultimately, the Court's refusal to intervene allowed the candidate who *lost* the election by over 2,000 votes to be seated as the governor. In allowing this seemingly perverse result, the Court explained:

*We have no more right to supervise the decision of the General Assembly in determining the result of this election than we have to supervise the action of the Governor in calling a special session of the legislature, or in pardoning a criminal, or the action of the legislature in contracting debts, or determining upon the election of its members, or doing any other act authorized by the Constitution.*

*Id.* at 297, 56 S.W. at 181 (emphasis added).

The decision in *Taylor v. Beckham* has stood for over 100 years. Yet, today, without citation or discussion, it has been buried along with Sections 28, 38, and 43 of the Constitution of Kentucky. Because I believe that *Taylor v. Beckham* and our Constitution deserve a decent funeral, I offer this eulogy.

## I. Jurisdiction—First Principles

To begin with, I do not believe this case should even be before the Court. In January 2005, the Franklin Circuit Court issued a temporary injunction against Stephenson. A motion for interlocutory relief was promptly filed with the Court of Appeals, and we transferred the motion to our own docket. In March 2005, rather than reaching the merits of the controversy, the Court issued a short Opinion and Order, upholding the temporary injunction on grounds that the trial court had not abused its discretion. Justice Keller, joined by Justice Scott, filed a vigorous dissent in which he argued that the majority failed to answer the more fundamental question of whether the circuit court, indeed *any* Kentucky court, had jurisdiction to pass on the issues raised by the litigants. Justice Keller reasoned, I think persuasively so, that because Section 38 of the Kentucky Constitution grants to the Senate the exclusive power to judge the elections, returns, and qualifications of its

own members, the courts have no power, and thus no jurisdiction, to decide such issues. Justice Keller also concluded that the jurisdiction to decide the bona fides of a candidate, as allowed by KRS 118.176, ceases to exist once the election begins.

Unfortunately, the Court chose not to publish its Opinion and Order, thus Justice Keller's dissent remained unpublished. But I happen to agree with Justice Keller's reasoning, both as to Section 38 and KRS 118.176, and think that the Court should have disposed of this case when it first had the chance in March 2005. I also agree that the question of jurisdiction is fundamental in this case. While the case's procedural posture has shifted extensively since Justice Keller wrote his dissent, it would be an exercise in repetition for me to attempt to recreate the substance of Justice Keller's extensive critique and in futility for me to try to surpass the quality of the opinion on those issues. I also think that Justice Keller's dissent should have been published initially. Therefore, I have decided to adopt and incorporate it into my own opinion as a statement of the fundamental principles underlying my own dissent. The following lengthy passage, demarcated by two sets of five asterisks, is the complete text of Justice Keller's dissent.[†]

\* \* \* \* \*

## DISSENTING OPINION BY JUSTICE KELLER

### I. INTRODUCTION

The majority has declined to address the merits of the case, choosing instead to limit its review to whether the Franklin Circuit Court abused its discretion in granting the temporary injunction. While I agree that it is not necessary to address the merits, I disagree with the artificial limitation on our review that the majority has chosen to impose. This is because the real issue—and one which must first be resolved before ever reaching any other issue, including the one purportedly addressed in the majority opinion—is whether the circuit courts ever had jurisdiction to consider this case. Because the Kentucky Constitution contains an express separation of powers among the three branches and provides that the Senate itself shall be the sole judge of the qualifications and elections of its members, the Court of Justice, as a whole, lacks jurisdiction in this case. But by ignoring these foundational aspects of our Constitution, indeed, *by failing even to ask the question of whether the circuit court had jurisdiction,* the majority opinion, in allowing the temporary injunction to stand, permits the circuit court to continue to consider a matter that is expressly reserved to another branch of our government. The question of jurisdiction, however, is paramount and must be addressed. For this reason, I respectfully dissent.

Movant, Dana Seum Stephenson, seeks relief from a temporary injunction granted by the Franklin Circuit Court. The substantial probability of success at trial by the moving party, which was Respondent, Virginia L. Woodward, in the circuit court, is a controlling issue in determining

---

[†] I have made a few changes to the text of Justice Keller's opinion, but these are limited to (1) converting his footnote designations from numbers to lower-case letters in order to differentiate his footnotes from my own, which are denoted by symbols before the quoted dissent and numbers afterward; (2) correcting typographical errors that slipped through what was no doubt an expedited writing and editing process in March 2005; and (3) correcting the paragraph structure of the quotation associated with footnote h, the citation in footnote o, and the omission of two words from the text of the quotation associated with footnote u.

whether to issue a temporary injunction.[a] If the circuit court lacks jurisdiction, then, obviously, there is no possibility of success at trial and a temporary injunction may not issue. But more importantly, consideration of that question would require submitting to the trap that the majority has fallen into because if jurisdiction does not exist, the question of the appropriateness of a temporary injunction is entirely premature. Thus, I focus my analysis on the preliminary question of jurisdiction, i.e., the fundamental condition precedent for the exercise of power by a court.

## II. THE GENERAL ASSEMBLY HAS EXCLUSIVE JURISDICTION TO DETERMINE THE ELECTIONS AND QUALIFICATION OF ITS MEMBERS

In granting the temporary injunction in this case, the Franklin Circuit Court, relying in part on *Rose v. Council for Better Education*,[b] stated that "[t]he Judicial Branch clearly has jurisdiction to consider and review whether actions of the Legislative Branch violate the Kentucky Constitution." While this is generally correct, if the Constitution expressly removes a given question from the purview of the Court of Justice, then none of the Commonwealth's courts may address the question. Section 38 of the Kentucky Constitution appears to have done exactly that: "Each house of the General Assembly shall judge of the qualifications, elections and returns of its members, but a contested election shall be

determined in such manner as shall be directed by law."[c]

The question of whether the Kentucky Constitution grants the courts jurisdiction to decide election matters after an election has been held is well-settled law. As Judge McCrary noted more than one hundred years ago: "The courts will not undertake to decide upon the right of a party to hold a seat in the Legislature, where by the constitution each house is made the judge of the election and qualifications of its own members . . . ."[d] More importantly, our own precedent firmly holds that jurisdiction to decide such election questions lies exclusively in the hands of the General Assembly.

In *Taylor v. Beckham*,[e] our predecessor court was faced with the interpretation of Section 90 of the Kentucky Constitution, which provides, in language strikingly similar to that contained in Section 38, that "[c]ontested elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly, according to such regulations as may be established by law." W.S. Taylor and William Goebel were candidates for Governor in the 1899 election. John Marshall and J.C.W. Beckham were candidates for Lieutenant Governor. Taylor and Marshall received the majority of votes in their respective races. After the election, their opponents initiated an election contest by giving notice to the General Assembly. When the General Assembly convened in January 1900, it initiated an election contest inquiry as prescribed in the statutes

a. *Maupin v. Stansbury*, 575 S.W.2d 695 (Ky. App.1978); 7 KURT A. PHILIPPS, JR., KENTUCKY PRACTICE, RULES OF CIVIL PROCEDURE ANNOTATED, Rule 65.04, cmt. 2 (5th ed. West Group 1995).

b. 790 S.W.2d 186 (Ky.1989).

c. KY. CONST. § 38.

d. GEORGE W. McCRARY, A TREATISE ON THE AMERICAN LAW OF ELECTIONS

§ 317, at 237 (4th ed. 1897) [hereinafter McCRARY, AMERICAN LAW OF ELECTIONS]; *see also id.* § 377, at 285 ("Nor will mandamus be available for one claiming a seat in a State Legislature where the Legislature is empowered to judge the election of its members.").

e. 108 Ky. 278, 56 S.W. 177 (1900).

passed pursuant to Section 90. On February 2, 1900, the General Assembly declared Goebel and Beckham to have been elected governor and lieutenant governor in the November 1899 election. Taylor and Marshall sought remedy from the courts.

The Court of Appeals ultimately declined to decide the case, holding that the Constitution gave the Legislature exclusive jurisdiction over the matter and that "the courts are without jurisdiction to go behind the record made by the legislature under the constitution."[f] In reaching this decision, the Court noted that Section 27 of the Constitution provides strict separation of the legislative, executive, and judicial powers, and that "the state constitution was intended to maintain the *absolute independence* of the legislative branch of the government ...."[g] The Court also noted:

> [T]he judiciary have no power to sit in judgment upon the motives of an independent branch of government, or to deny legal effect to the record of its actions solemnly made by it pursuant to the constitution. If this were allowed, it would soon follow that the independence of the legislature would be destroyed altogether ....

The constitution of this state creates the offices of governor and lieutenant governor. It provides how they shall be filled by election. *It also provides how the result of that election shall be determined.* In each of the four constitutions of this state the general assembly has been made the exclusive tribunal for determining this matter. *This shows a clear and settled purpose to keep this political question out of the courts.* We have no more right to supervise the decision of the general assembly in determining the result of this election than we have to supervise the action of the governor in calling a special session of the legislature, or in pardoning a criminal, or the action of the legislature in contracting debts, or determining upon the election of its members, or doing any other act authorized by the constitution.[h]

Siding with Taylor and Marshall would have required that the Court "usurp[ ] the power vested in the general assembly by the constitution, for by its express terms only the general assembly can determine a contested election for governor and lieutenant governor."[i] And consequently, the Court held that " '[t]he courts have no right to adjudicate upon these questions, or to decide such contests.' "[j]

Though the *Beckham* Court was faced with interpreting Section 90, due to the similarity between the two sections, it also

---

f. *Id.* at 182. It should also be noted that after losing their case before our predecessor court, Taylor and Marshall sought review by the United States Supreme Court on the grounds that their Fourteenth Amendment property rights and the constitutional guarantee of a republican form of government had been denied. *Taylor v. Beckham,* 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900). The Supreme Court noted that "public offices are mere agencies or trusts, and not property as such," *id.* at 577, 20 S.Ct. 890 (emphasis added), and that enforcement of the republican form of government "guaranty belonged to the political department." *Id.* at 578, 20 S.Ct. 890. As such, the Court ruled that the

case fell outside its jurisdiction and dismissed the case. *Id.* at 581–81, 20 S.Ct. 890.

g. *Beckham,* 56 S.W. at 179 (emphasis added).

h. *Id.* at 181 (emphasis added).

i. *Id.* at 182.

j. *Id.* at 183 (quoting *Batman v. Megowan,* 1 Met. 533, 58 Ky. 533 (Ky.1859)) (emphasis added); *see also* McCRARY, AMERICAN LAW OF ELECTIONS § 386, at 291 ("The doctrine announced is that courts of equity have no inherent power to try contested elections, and can only exercise such power where it has been conferred by express enactment, or necessary implication therefrom.").

addressed Section 38. And though the applicability of the analysis above to Section 38 is obvious, given that Section 38 grants to the General Assembly the power to determine the elections and qualifications of its own members, some of this discussion is included to show that the question of the courts' jurisdiction, or more appropriately the lack thereof, has already been considered and addressed by our courts. First of all, the Court noted: "It will be observed that the phraseology [of section 38] is substantially the same as section 90 . . . ." [k] The Court then posed the following hypothetical situation:

> Suppose these suits had been brought by two members of the general assembly, alleging, in effect, the same facts as are alleged in this case, would anybody suppose that the judiciary of the state would have the power to go behind the legislative journals, or to supervise the propriety of the legislative action, in determining the election of its members? Could a member of the general assembly, who had received a certificate from the canvassing board, and been afterwards ousted from the house to which he belonged on a contest, allege and show that the house had acted arbitrarily, depriving him of a pre-existing right, and denying to him the emoluments of the office for the term? Could it be maintained that such action by either house of the general assembly violated any protection afforded him by the constitution of the United States, or that for this cause the action of the state authorities under the state constitution, by virtue of which he claimed to have been elected, might be overruled? [l]

The Court's use of the hypothetical as evidence of why Section 90 prohibited the courts from interfering with the General Assembly's decision under that section assumed *that it was inconceivable that the courts would interfere with a decision of the General Assembly made under the similar language of Section 38.* The Court also stated that the United States Supreme Court had answered these questions posed by its hypothetical in *Wilson v. North Carolina.*[m] In *Wilson,* a state officer, who had been arbitrarily removed from office, applied to the Supreme Court for redress, *but his case was dismissed for want of jurisdiction.* The *Beckham* Court then noted:

> *If the state may arbitrarily remove an officer once appointed, we see no reason why it may not provide such means a[s] it sees proper for the determination of its own elections. If it has not such power, then its sovereignty as a state exists only in name.* The congress of the United States has, by the constitution, the power to judge of the qualifications, elections, and returns of its members. In not a few cases it has been supposed to have acted arbitrarily in such matters, but it was never maintained that one who was ousted of his seat in congress on a contest could take the matter into the courts to supervise the action of congress on such grounds as are alleged in this case. Yet the power of congress, under the constitution, in determining which of two claimants was in fact elected to a seat in that body, both being admittedly qualified, is, under the constitution, just the same as the power of our general assembly in determining a contested election for governor and lieutenant governor.[n]

---

k. *Beckham,* 56 S.W. at 184.

l. *Id.*

m. 169 U.S. 586, 18 S.Ct. 435, 42 L.Ed. 865 (1898).

n. *Beckham,* 56 S.W. at 184 (emphasis added).

Our predecessor court addressed Section 38 specifically, and more recently, in *Raney v. Stovall*,[o] where Raney, a state senator, was appointed as a deputy sheriff halfway through his term as senator. The Senate passed a resolution stating that Raney was "a duly qualified senator"[p] even though, as the Court noted, it was quite possible that "the office of senator and deputy sheriff are incompatible and the acceptance of the second office vacates the first."[q] Rather than declaring Raney unqualified and removing him from office, the Court stated that "authoritative adjudications are to the effect that the right of a legislative body to judge the qualifications of its members includes the right to decide finally whether or not one of them has become disqualified during his term of office, and this decision is not subject to court review."[r] This is because "the vesting of certain powers in a legislative body may constitute exclusive power to pass upon the qualifications of its members, thereby depriving the court of authority to adjudicate on that subject."[s]

Section 38 is just such a vesting of power in the legislature. Thus, as in *Raney*,

> Appell[ant] suggests the action of the Senate with respect to [Stephenson] constituted such a clear violation of the Constitution that the courts should rectify the error. However, *the fact that the legislature may make a wrong decision is no reason why the judiciary should invade what has been designated as the exclusive domain of another department of government.* See *Taylor v. Beckham*, 108 Ky. 278, 56 S.W. 177, 49 L.R.A. 258. We must assume the Senate in good

faith will not knowingly permit violations of other constitutional provisions. With respect to this subject matter, the people have reposed that responsibility in the legislature. *The courts are without jurisdiction to review its solemn determination.*[t]

Though the facts in this case differ from *Beckham*, insofar as the issue involved an election contest over executive offices, and from *Raney*, insofar as the senator in question had already been deemed qualified, the principles involved are identical. The Kentucky Constitution says what it means and means what it says: The houses of the General Assembly shall judge of the qualifications, elections, and returns of their members. "The doctrine of separation of governmental powers runs like a golden thread throughout the fabric of our government."[u] Kentucky is one of the few states to incorporate the notion of separation of powers so explicitly in our Constitution. As such, " '[e]ach to it own' is the law of the Constitution which . . . the Judiciary . . . must obey."[v] That the power to determine the elections and qualifications of its own members is granted *exclusively* to the General Assembly, not to the Courts, is beyond question.

In this case, the Senate exercised that power by finding that Stephenson was qualified to serve as a senator. And though the General Assembly might, by some objective measure, have been wrong, "[w]hether the assembly was right or not in its decision, it is not our province to determine."[w]

o. 361 S.W.2d 518 (Ky.1962).

p. *Id.* at 519.

q. *Id.*

r. *Id.* at 521–22.

s. *Id.* at 523.

t. *Id.* at 523–24.

u. *In re Appointment of Clerk of Court of Appeals*, 297 S.W.2d 764, 767 (Ky.1957) (citation omitted).

v. *Id.*

w. *Beckham*, 56 S.W. at 184.

But a much more important question is involved in the case, which is the integrity of our form of government as founded by our forefathers. If the action of the legislature may be disregarded by the courts, then it is no longer an equal and independent branch of the government within its constitutional jurisdiction, but the courts become the final depository of the supreme power of the state. *Judicial tyranny is no less tyranny because couched in the forms of law. There was great wisdom in dividing the powers of a republic between three equal and independent sets of officers. One operates as a check upon the other, and no greater blow to the perpetuity of our institutions could be given than to destroy this check.*[x]

*As such, the only reasonable conclusion is that the power to decide elections of members of the General Assembly is vested solely in the General Assembly itself, and that the courts lack any power even to entertain the questions presented.*

### III. KRS 120.195 AND KRS 118.176

The Franklin Circuit Court held that the General Assembly conferred jurisdiction on the courts by promulgating a statutory scheme for the settling of election contests pursuant to the mandate of the last half of Section 38. This holding is clearly in error. KRS 120.195 provides the statutory framework for *contesting* an election for a position in the General Assembly. The statute prescribes when and how an election contest is to be initiated and how proof is to be taken. Nowhere does the statute declare that the courts may participate in this decision-making process. In fact, the statute does not even say that the

General Assembly is to decide the question. This is because Section 38, which takes precedence over any statute, already declares that "[e]ach house of the General Assembly shall judge of the... elections and returns of its members...." Section 38's final independent clause only requires that this determination proceed according to law. And as such, the statutory mechanism that has been enacted to carry out the command of this final independent clause sets out the procedure to be followed by a *house* of the General Assembly, not a court, in making the ultimate decision. This is likely why the circuit courts did not rely on this statute in claiming jurisdiction.

Instead, the Franklin Circuit Court relied heavily on KRS 118.176, which provides the means for challenging the "good faith" or "bona fides of [a] *candidate,"*[y] and on the fact that the Jefferson Circuit Court had, ostensibly, issued a ruling pursuant to this statute. The Franklin Circuit Court maintained that an action under KRS 118.176 was an election contest as contemplated by Section 38 of the Constitution, and that, as such, it had jurisdiction to hear the case. But "[i]t is important to distinguish between an election contest and a pre-election lawsuit."[z] "An election contest obviously is a post-election procedure, involving an election that has been held, as distinguished from a pre-election suit to determine whether a person may be voted on as a candidate."[aa] As we have noted before, the pre-election challenge as to the "qualifications" of a candidate allowed in KRS 118.176 "is technically not an election contest."[bb] Thus, it is clear that this statute does not provide the means for pursuing an election contest, and that it is

x. *Id.*

y. KRS 118.176 (emphasis added).

z. *Noble v. Meagher,* 686 S.W.2d 458, 460 (Ky. 1985).

aa. *Fletcher v. Wilson,* 495 S.W.2d 787, 791 (Ky. 1973); *accord* KRS Chapter 120.

bb. *Noble,* 686 S.W.2d at 461.

not a means of maintaining the courts' jurisdiction after the election.

This makes sense because the statute, by its own terms, allows only a means to challenge the "bona fides" of a candidate:

> The bona fides of any candidate seeking nomination or election in a primary or general election may be questioned by any qualified voter entitled to vote for such candidate or by an opposing candidate by summary proceedings consisting of a motion before the Circuit Court of the judicial circuit in which the candidate whose bona fides is questioned resides.[cc]

A "bona fide" candidate, however, is merely "one who is seeking nomination in a primary or election in a general election according to law."[dd] Once the election is held, the person is no longer seeking nomination or election—that question has been decided by the voters. Indeed, once the election is held, the persons are no longer even "candidates." Rather, their race has been run and the winner has been decided by the voters. All that remains is to review the returns to ascertain the identity of the winner. The process of voting has transformed the candidates so that, in the case of a senate race, all that remains is a senator *elect*, who has a prima facie claim to the office, and the loser(s), who has no claim to the office.

Some might argue that this is a matter of mere semantic quibbling, but such a reading is supported by the distinction in *Noble* and *Fletcher* between pre-election challenges to who may be voted on as a candidate and a post-election "contest" to determine who is the lawful winner of the election. This reading is also necessary for the statute to pass constitutional mus-

ter, at least as applied to elections to the General Assembly. The circuit courts in this case have assumed that the portion of the statute that allows an action under KRS 118.176 to "be commenced at any time *prior to the general election*"[ee] means that as long as an action challenging the bona fides of a candidate is filed before the election begins, the bona fides, and thus the qualifications, of a candidate can then be determined, even if the determination does not occur until after the election. This reading is simply incorrect. For the courts to retain jurisdiction over such a case involving an election to the General Assembly after the election simply because the action was begun before the election would allow the courts to unconstitutionally invade that which is the exclusive province of the General Assembly. As discussed above, Section 38 vests in the General Assembly *sole jurisdiction* to determine the elections and qualifications of its own members. This couldn't be any clearer, especially when viewed in light of the pre- versus post-election division contemplated by *Noble* and *Fletcher*.

This also makes sense from a policy perspective. The voters need to know for whom they will have the opportunity to vote when they go to the polls; thus the ballot needs to be finalized *before* the election. This is why the statute allows the use of oral proof, requires that the action "be tried summarily and without delay,"[ff] and provides for an accelerated review by the Court of Appeals.[gg] A speedy determination of the slate of candidates is all the more important in light of the dual function of voting: "[I]t must be remembered that those constituting the majority or plurality not only vote for the candidate or measure of their choice, but they also vote

---

cc. KRS 118.176(2).
dd. KRS 118.176(1) (emphasis added).
ee. KRS 118.176(2).

ff. KRS 118.176(4).
gg. *Id.*

against the other candidate or candidates, and against the opposing side of the submitted measure."[hh] Allowing the circuit court to decide *after* the election that a candidate is not bona fide does a disservice to the candidates *and* to the voters, who are, in effect, disenfranchised because their votes, which they had thought were validly cast, are directed not to be counted. Nowhere is this more true than in those races where there are more than two candidates; those voters whose candidate of choice is later disqualified are deprived not only of voting for their first choice, but also their second choice. Thus, it is clear that the Legislature intended the statute to provide a fast and efficient means of challenging the "bona fides" of a candidate *before* the election.[ii]

Obviously, the action allowed in KRS 118.176 is, at most, complementary to the process envisioned by Section 38 of the Kentucky Constitution. In elections to the General Assembly, KRS 118.176 is applicable before the election takes place. After the election, any pending KRS 118.176 action is moot and the question of the bona fides of a "candidate" is irrelevant because Section 38 of the Constitution comes into play. In fact, the court's jurisdiction after the election is limited only to ordering the election officers to execute their duties, i.e., to certify the results shown on the returns.[jj] KRS 118.176 and Section 38 (and KRS 120.195) govern two distinct spheres—the pre-election period and the post-election period. The distinction between the two is more than just good policy or compliance with arbitrary rules; rather, the distinction is constitutionally mandated and is an integral part of Kentucky's separation of powers doctrine. Thus, it is clear that KRS 118.176 is not the means for pursuing an election contest; it does not provide a means of challenging anything after the election is over.

Consequently, it is incumbent on the challenger who wishes to proceed under KRS 118.176 to file such an action sufficiently in advance to allow the circuit court to determine the candidate's bona fides before the election. But Woodward did not file her challenge in time, and KRS 118.176 cannot be used now to invoke the jurisdiction of the courts. The courts' jurisdiction under KRS 118.176 evaporated when the polls opened on November 2, 2003. The responsibility, indeed, the power, to make the decision then fell solely to the Senate under § 38 of the Constitution. Thus, because Stephenson's bona fides were not found lacking before the election, Woodward's claim in that regard was rendered moot once the election began, and the decision of the Jefferson Circuit Court ordering the Jefferson County Board of

---

**hh.** *McKinney v. Barker*, 180 Ky. 526, 203 S.W. 303, 306 (1918).

**ii.** *See also Noble v. Meagher*, 686 S.W.2d 458, 461 (Ky.1985); *Fletcher v. Wilson*, 495 S.W.2d 787, 791 (Ky.1973).

**jj.** McCRARY, AMERICAN LAW OF ELECTIONS § 317, at 237 ("The courts will not undertake to decide upon the right of a party to hold a seat in the legislature, where by the constitution each house is made the judge of the election and qualifications of its own members; but a court may by mandamus, compel the proper certifying officers to discharge their duties and arm the parties elected with credentials necessary to enable them to assert their rights before the proper tribunal. And, inasmuch as canvassing and returning officers act ministerially and have no power to go behind the returns, or inquire into the legality of votes cast and returned, a court will by mandamus compel them to declare and *certify the result as shown by the returns,* because that is their plain duty; but the award of a certificate of election under such mandate, will not conclude the legislative body in determining the election." (footnotes omitted)).

Elections not to count Stephenson's votes is void.

## IV. CONCLUSION

We should admit that this is a pure political question, and that, as such, we cannot answer it. That task is left to the Legislature itself. And if the people, from whom all the power of this Commonwealth derives,[kk] do not like the Legislature's answer, they may act to correct it through the political process, for they are the ultimate check on abuse by the government. Thus, the power to resolve this wholly political issue ultimately lies in the body politic. The majority opinion, however, under the guise of maintaining the status quo, ignores these democratic principles by allowing the circuit court to continue to interfere where it is only the Legislature's, and thus the people's, prerogative to tread. And in doing so, the majority adds insult to injury because the concurrence of the Senate's refusal to seat Woodward, when it has found that Stephenson was properly qualified and elected, with the circuit court's refusal to allow Stephenson to be seated has served to deprive the 37th Senatorial District of representation in the Senate.[ll]

Where the remedy lies exclusively in the hands of another branch of government, as is the case here, the circuit court may not even address the issue. In such a case, the Court of Justice as a whole has *"no jurisdiction to act at all."* [mm] Thus, the circuit court lacked the power even to consider Woodward's case, much less to grant the temporary injunction, and any order issued in the case, other than one to dismiss for lack of jurisdiction, is void. Because the majority disregards this long-standing rule by allowing the Franklin Circuit Court's temporary injunction to remain in place, thus preserving a status quo that the circuit court had no legitimate power to bring about in the first place, I respectfully dissent.

SCOTT, J., joins this dissenting opinion.

kk. KY. CONST. § 4 ("All power is Inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety, happiness, and the protection of property. For the advancement of these ends, they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such a manner as they may deem proper.").

ll. *See* McCRARY, AMERICAN LAW OF ELECTIONS § 203, at 227–28 ("If the office were to remain vacant pending the contest it might frequently happen that the greater part of the term would expire before it could be filled; and thus *the interests of the people might suffer for the want of the services of a public officer.* Besides, if the mere institution of a contest was to be deemed sufficient to prevent the swearing in of the person holding the usual credentials, it is easy to see that very great and serious injustice might be done. If this were the rule, it would only be necessary for an evil disposed person, to contest the right of his successful rival, and to protract the contest as long as possible, in order to deprive the latter of his office for at least a part of the term. And this might be done, by a contest having little or no merit on his side, for it would be impossible to discover, in advance of an investigation, the absence of merit. And again, if the party holding the ordinary credentials to an office, could be kept out of the office by the mere institution of a contest, the organization of a legislative body, such for example as the House of Representatives of the United States, might be altogether prevented, by instituting contests against a majority of the members, or what is more to be apprehended, the relative strength of political parties in such a body might be changed, by instituting contests against members of one or the other of such parties. These considerations have made it necessary to adopt, and to adhere to, the rule, that the person holding the ordinary credentials shall be qualified, and allowed to act pending a contest and until a decision can be had on the merits.").

mm. *R.H. Hobbs Co. v. Christian,* 325 S.W.2d 329, 335 (Ky.1959) (emphasis added).

* * * * *

## II. Jurisdiction—Further Thoughts

The majority has sidestepped the jurisdictional hurdle and reached the merits of the controversy by holding that the courts in Kentucky have jurisdiction to determine the qualifications of a candidate under KRS 118.176, even if that determination occurs after an election is held, so long as the challenge to the candidate's qualifications was filed prior to the election. In essence, the majority argues that because the statute contains only the requirement that the challenge be initiated before the election—and does not contain any additional requirement that the challenge be decided before the election—the Jefferson Circuit Court's jurisdiction necessarily continued after the election was held. The majority claims that this resolves the controversy because there was no appeal of the Jefferson Circuit Court's ruling that Stephenson was not a qualified candidate and that the Jefferson County Board of Elections was enjoined from counting any votes cast for her. Thus, the order is still in effect, meaning that Stephenson cannot be seated as a Senator.

Like Justice Keller, I think that a court's jurisdiction to decide an action brought under KRS 118.176 "evaporates" once the election begins. The clear intent of the statute is to prevent voters from casting their votes for non-bona-fide candidates, not to nullify those votes after the fact of their casting. I continue to believe that this case can and should be disposed of on the jurisdictional grounds elucidated by Justice Keller.[1] While I have only a little to add to his analysis, the majority's reliance on KRS 118.176 as the claimed source of jurisdiction over this controversy requires some additional response on my part.

The majority opinion goes on at great length, spending a full third of its text, in an attempt to refute Justice Keller's contention that jurisdiction to decide a cause of action brought under KRS 118.176 ceases after the election begins. As Woodward's brief notes, such an approach is not completely unprecedented in our case law. Indeed, there are a few Kentucky opinions involving challenges under the statute, or an earlier analogous statute, where a decision as to a candidate's bona fides was rendered after the disputed election.[2] See

1. In reaching this conclusion, I recognize that the federal courts, in approaching the federal constitutional analog of Section 38—Article I, section 5, of the United States Constitution—have held that while they technically have subject-matter jurisdiction over such disputes, they present non-justiciable political questions that cannot be decided by the judiciary. See, e.g., McIntyre v. Fallahay, 766 F.2d 1078 (7th Cir.1985). This approach makes sense given that cases that are only tangentially related to Article I, section 5, but that are nonetheless decidable by the courts can arise. E.g., Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). To be fair, however, it has been noted elsewhere that the holding in Powell was basically that "Article I, section 5 had no application, since the House action in question did not consist of judging 'qualifications' within the meaning of the pro-

vision." Morgan v. United States, 801 F.2d 445, 448 (D.C.Cir.1986). Nevertheless, I continue to employ the lack-of-jurisdiction concept because our case law, which relies in part on our strict separation of powers provisions, has historically held that Section 38 bars jurisdiction. Even among the federal courts, such an approach is not unheard of. See id. at 447 (holding in a case involving Article I, section 5, that "without need to rely upon the amorphous and partly prudential doctrine of 'political questions,' we simply lack jurisdiction to proceed." (citations omitted)). Ultimately, however, it makes no difference which approach we take because both lead to the same result, since courts simply will decline to decide these cases no matter which rationale they choose.

2. I note in passing, however, that the majority opinion surprisingly fails to cite these cases

*Noble v. Meagher,* 686 S.W.2d 458 (Ky. 1985) (rendered in February 1985, following the November 1984 election); *Fletcher v. Wilson,* 500 S.W.2d 601 (Ky.1973) [hereinafter *Fletcher II* ] (rendered in October 1973, following the May 1973 primary election); *Hoffman v. Waterman,* 141 S.W.3d 16 (Ky.App.2004) (the circuit court did not rule until 46 days after the 2004 primary election). But *Noble* is inapplicable because the Court failed to reach the merits of the KRS 118.176 issue. Instead, the Court disposed of the case by vacating the order of the circuit court because the cause had been brought in the wrong court, which therefore had no jurisdiction. In *Hoffman,* the Court of Appeals declined to find that the candidate was unqualified. Such a result is not entirely inconsistent with declining jurisdiction, especially when one considers the court's reasoning, based on *Heleringer v. Brown,* 104 S.W.3d 397 (Ky.2003), that the public policy in favor of broad voter participation supports allowing a candidacy to continue. Moreover, the mere fact that the Court of Appeals accepted jurisdiction in that case is not binding precedent on this Court.

Realistically, the only case that gives me pause in this regard is *Fletcher II.* In that case, our predecessor court held, after the primary election had been completed, that a candidate for the Democratic nomination for the office of local magistrate had not properly filed his candidacy papers. Therefore, he "was not entitled to have his name on the ballot, and, thus not being a qualified candidate, [could not] be awarded the nomination." *Fletcher II,* 500 S.W.2d at 607. As a result, the Court declared that there had been no valid primary election, leaving the Democratic nomination vacant. At first glance, this case seems like clear precedent for the majority's claim that jurisdiction to pass on the ques-

for the proposition that KRS 118.176 jurisdic-

tion of the qualifications of a candidate continues after the election is held. But when viewed in the proper context—namely, that this was the second appeal in the matter—its apparent precedential value is diminished.

The first appeal in the matter, *Fletcher v. Wilson,* 495 S.W.2d 787 (Ky.1973) [hereinafter *Fletcher I* ], was brought to determine if the voter plaintiffs had standing to challenge the qualifications of a candidate. The Court held that voters indeed had the right to bring such a challenge, and remanded the case for further proceedings. In explaining its holding, the *Fletcher I* Court, as noted above in Justice Keller's dissent, explicitly distinguished between an election contest and a suit brought to decide whether a person was a legitimate candidate: "An election contest obviously is a post-election procedure, involving an election that has been held, as distinguished from a pre-election suit to determine whether a person may be voted on as a candidate." *Id.* at 791. The Court then noted that "once the primary has been held it determines who will be the qualified candidate in the general election (subject only to a contest of the primary)." *Id.* The Court also cited voluminous case law for the proposition that "questions ... as to the right of a person to be placed on a ballot as a candidate ... should be *decided* before the voting takes place." *Id.* at 792 (emphasis added). The Court repeated this proposition in various forms, like some talismanic mantra, no less than four more times throughout the remainder of the opinion. *Id.* at 792–93 ("[T]he real basis of the holding in the group of cases just above cited is that the eligibility of a candidate for nomination or elections should ... be *determined* before the voting takes place." (emphasis added)); *id.* at 793

tion continues after the election.

("That holding is consistent with the holding in the cases hereinbefore discussed, that questions related to the placing of the candidate's name on the ballot should be *determined* before the voting." (emphasis added)); *id.* (discussing further "the policy ... that questions of the right of a candidate to be on the ballot should be *decided* before the voting takes place." (emphasis added)); *id.* at 794 ("Thus, there are indications that the policy, that questions of the right of a candidate to be on the ballot should be *decided* before the voting takes place, could be extended so as to preclude postelection contests of general elections on such grounds." (emphasis added)).

In light of the strong language used in *Fletcher I*, it is unclear why the Court appeared to back away from this stance in the second appeal, especially since *Fletcher I* and *Fletcher II* were authored by the same person, Commissioner Cullen. Admittedly, the Court had somewhat hedged its language in *Fletcher I*, noting that "questions of the kind ... must be raised before the primary." *Fletcher I*, 495 S.W.2d at 792; *see also id.* at 794 (noting "the policy that questions of the right of a candidate to be on the ballot should be raised before the voting takes place ...."); *cf. id.* at 792 (noting "the rule that qualification to go on the ballot ... cannot be raised after the election.").[3] Despite these statements, the weight of the discussion in *Fletcher I* appears to require that a *decision* must come before the election is held.

I can only conclude that the inconsistency between the two cases is due to the fact that, as Chief Justice Palmore noted in his majority opinion in the *third* appeal, "the law on this subject partakes of a labrynthian morass ...." *Fletcher v. Teater*, 503

S.W.2d 732, 734 (Ky.1974) [hereinafter *Fletcher III* ]. In that case, the Court appears to have taken the reins more tightly, given that the Chief Justice himself wrote the opinion, rather than delegating to a Commissioner as in the earlier cases. In doing so, the Court ultimately sided with *Fletcher I*:

> It may be conceded also that what was said in the first *Fletcher* opinion on the subject of general elections is, technically, dictum. But opinions are written for the purpose of assisting lawyers and courts in the practice and disposition of future cases. *The first* Fletcher *opinion clearly and unmistakably marks out the path to be followed* in this one.

*Id.* (emphasis added). In essence, the Court revived the analysis in *Fletcher I*. This, in turn, leads me to conclude that *Fletcher II* has no precedential value.

The majority also argues the general rule that once a court acquires jurisdiction to decide a case, subsequent events cannot defeat that jurisdiction. But, as the majority itself notes, this is only the *general* rule. The absolute textual commitment in Section 38 of the power to judge the qualifications, elections, and returns of a legislative body's members would seem, at the very least, to provide an exception to this general rule. But even if I were to grant that this general rule, the holding in *Fletcher II*, or the lack of limiting language in KRS 118.176 were enough to sustain the majority's conclusion that jurisdiction over the limited questions that can be raised under KRS 118.176 continues after the election, I still could not join the majority for the reasons discussed below.

Finally, I must respond to the majority's policy argument that adherence to the

---

3. The rendition date of *Fletcher I*—June 1, 1973, after the primary election was held—will no doubt lead some to claim further internal inconsistency. But, as was noted in the second appeal, "the mandate of this court on [the first] appeal was issued before the primary took place ...." *Fletcher II*, 500 S.W.2d at 603.

"evaporation" of jurisdiction approach would allow a "recalcitrant judge ... [to] simply refus[e] to adjudicate the KRS 118.176 motion." *Ante* at 172–73. Were such an unfortunate situation to arise, the aggrieved candidate could seek to compel the judge to act by applying for one of our extraordinary writs. And though such writs are difficult to obtain, in an election situation, where time is of the essence, it is likely that the courts would be sympathetic. Our rules even allow a petitioner seeking such a writ to request emergency intermediate relief, CR 76.36(4), which, given the statute's command that "[t]he motion shall be tried summarily and without delay," KRS 118.176(2), would also likely be granted. Moreover, the majority's worst-case scenario has already happened: The circuit judge in this case admitted at the post-election hearings that he intentionally waited until after the election to address Woodward's KRS 118.176 petition because it could have been rendered moot had she won the election.

### III. Mootness

Even if occurrence of the election does not give rise to a jurisdictional bar to a cause brought under KRS 118.176, it does render any claim under the statute moot. Though it was addressed in the context of his jurisdictional discussion, Justice Keller argued that once the election was over, the winning candidate for Senator becomes a Senator-elect and is no longer a "candidate" in the sense contemplated by KRS 118.176. Yet the statute only allows for a challenge to the bona fides of a "candidate." Justice Keller's argument is just as compelling, if not more so, when understood as a claim about mootness, rather than jurisdiction. In fact, given the major-

ity's explicit reliance on the lack of language in KRS 118.176 requiring that an action brought thereunder be adjudicated prior to the election in question, this may be the sounder approach. Nonetheless, the effect is the same—the court's power to decide the issues evaporates because the case no longer presents a live controversy.

Furthermore, even if one were to conclude that the matter presented a live controversy after the election, meaning that the Jefferson Circuit Court action was not immediately rendered moot, surely that controversy died once the Senate affirmatively voted to seat Stephenson as a Senator. At that time, she became a member of the Kentucky Senate,[4] and that exercise of a constitutionally granted power ended the controversy and decided the rights of the parties involved. This conclusion, however, is based on what I think is yet another insurmountable obstacle—one that the majority fails to address, much less refute—namely, and as discussed below, the inability of any entity to bind the Senate in its exercise of its constitutionally conferred power under Section 38.

### IV. Binding the Senate

Perhaps most importantly, the majority's approach is built on the fundamentally mistaken belief that any entity—including the circuit court, this Court, or the state board of elections—can bind the Senate as to questions related to the qualifications, elections, and returns of its members. Let us assume that the Jefferson Circuit Court's order enjoining the Board of Elections from counting any votes cast for Stephenson was valid and binding. Natu-

---

4. This, of course, answers the majority's claim that I have construed the election itself as having made Stephenson a Senator. To reiterate Justice Keller's point, she was only a Senator-elect until the Senate voted to seat her as a member. But, as discussed below, that point does not end the necessary analysis.

rally, the effect of the order was that Stephenson was not certified as the winner of the election. The majority treats this order, which was not appealed, as having *res judicata* effect. Indeed, this is the only justification they provide for their remedy.

The problem with this approach, however, is that Section 38 of the Kentucky Constitution again comes into play, not by stripping the courts of jurisdiction to adjudicate the question of candidate qualifications, but by placing the ultimate authority to determine that question in the hands of the relevant legislative body, with the courts and other entities serving only in a complementary capacity. Though there is a dearth of case law on this particular topic in Kentucky, the language in Section 38 of the Kentucky Constitution is all but identical to that in Article I, section 5, of the United States Constitution. And there is ample federal case law interpreting the effect of that provision, all of which indicates that *no entity* can bind a house of the legislature in judging the elections, returns, or qualifications of its members.

Foremost among these cases is *Roudebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), which involved a challenge by R. Vance Hartke to a state-run recount of the votes cast in his race for United States Senate. Hartke claimed that the explicit constitutional delegation to the Senate of the power to decide the elections and returns of its members was absolute and that any state-level recount was thereby barred as a usurpation of the Senate's power. The Supreme Court ultimately declined to block the recount, but in doing so, it noted: "Once this case is resolved and the Senate is assured that it has received the final Indiana tally, *the Senate will be free to make an unconditional and final judgment* under Art. I, § 5." *Id.* at 19, 92 S.Ct. at 808 (emphasis

added). The Court allowed the recount to proceed because

a recount can be said to 'usurp' the Senate's function only if it frustrates the Senate's ability to make an independent final judgment. A recount does not prevent the Senate from independently evaluating the election any more than the initial count does. *The Senate is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount.*

*Id.* at 26, 92 S.Ct. at 811 (footnotes omitted, emphasis added). Even the dissent in *Roudebush* agreed on the fundamental point "that in the end the Senate will be the final judge . . . ." *Id.* at 32, 92 S.Ct. at 814 (Douglas, J., dissenting); *see also id.* at 33, 92 S.Ct. at 815 (Douglas, J. dissenting) ("What the Senate should do in the merits is not a justiciable controversy. The role of the courts is to protect the Senate's exclusive jurisdiction over the subject matter . . . ."). In essence, the Court allowed the recount to proceed while acknowledging that it was only complementary to the Senate's plenary power to "[j]udge of the Elections, Returns and Qualifications of its own Members . . . ." U.S. Const. art. I, § 5. At most, such a complementary process may "be characterized as ministerial, or perhaps administrative . . . ." *Roudebush*, 405 U.S. at 21, 92 S.Ct. at 809.

In an earlier case, *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 613, 49 S.Ct. 452, 455, 73 L.Ed. 867 (1929), the Court indicated that the Senate could not even be bound by the findings of an internal committee that it had itself created to aid in determining questions regarding the elections, returns, and qualifications of members. The Court noted:

Exercise of the power [under Article I, section 5,] necessarily involves the ascertainment of facts, the attendance of wit-

nesses, the examination of such witnesses, with the power to compel them to answer pertinent questions, to determine the facts and apply the appropriate rules of law, and, finally, *to render a judgment which is beyond the authority of any other tribunal to review.* In exercising this power, the Senate may, of course, devolve upon a committee of its members the authority to investigate and report; and this is the general, if not the uniform, practice. When evidence is taken by a committee, the pertinency of questions propounded must be determined by reference to the scope of the authority vested in the committee by the Senate. But undoubtedly the Senate, if it so determine, may in whole or in part dispense with the services of a committee and itself take testimony, *and, after conferring authority upon its committee, the Senate, for any reason satisfactory to it and at any stage of the proceeding, may resume charge of the inquiry and conduct it to a conclusion, or to such extent as it may see fit.* In that event, the limitations put upon the committee obviously do not control the Senate; but that body may deal with the matter, without regard to these limitations, subject only to the restraints imposed by or found in the implications of the Constitution.

*Id.* at 613–14, 49 S.Ct. at 455 (emphasis added). These cases expose the fallacy of the majority's contention that KRS 118.176 functions as an irrevocable delegation by the General Assembly to the courts of the power to decide the qualifications of candidates for either house. Even if the statute operates as a delegation of power, it is, at most, a delegation of an administrative power to the courts to collect and evaluate evidence. As such, the decision or judgment of any court sitting in this capacity can be revisited and entirely supplanted by the relevant legislative body. Section 28

of our own constitution, with its express prohibition on the "exercise [by one branch of government of] any power properly belonging to either of the others," further supports this contention. The power to determine the elections, returns, and qualifications of the members of a legislative house is expressly placed in the house itself by Section 38. It is difficult to imagine a clearer example of a textual commitment of a power to a specific branch of government. As such, that power, properly belonging only to the legislative branch, cannot be exercised by either of the other branches without breaching Section 28's guarantee of separation of powers.

This bedrock principle has been followed consistently. As Judge Easterbrook noted in a case involving a dispute over an Indiana race for United States Representative that was ultimately decided by the slim margin of only four votes: "The House is not only the 'Judge' but also final arbiter. Its decisions about which ballots count, and who won, are not reviewable in any court." *McIntyre v. Fallahay,* 766 F.2d 1078, 1081 (7th Cir.1985). He then went even further, noting:

Nothing we say or do, nothing the state court says or does, could affect the outcome of this election. Because the dispute is not justiciable, it is inappropriate for a federal court even to intimate how Congress ought to have decided. The doctrine of justiciability is designed to prevent meddlesome advisory opinions fully as much as it was designed to prevent unwarranted interference with decisions properly made elsewhere. When a court has no right to determine the outcome of a dispute, it also has a duty not to discuss the merits of that dispute.

*Id.* (footnote and citation omitted). At least in the federal courts, it is an unquestioned premise, bordering on legal fact,

that "a . . . court may not award relief [in such a case]," *id.,* which, in turn, means that such a case "no longer presents a 'case or controversy' . . . ." *Id.*

These issues were raised again in *Morgan v. United States,* 801 F.2d 445 (D.C.Cir.1986), another case involving the same United States House of Representatives election that was disputed in *McIntyre.* The specific fight in *Morgan* concerned the substance of the procedures used by the House in deciding the election. The lower court "dismissed the suit with prejudice as the classic political question which is inappropriate for judicial review." *Id.* at 446 (internal quotation marks omitted). The court of appeals, in an opinion by then Circuit Judge Scalia, noted that "[s]ummary affirmance is appropriate where the merits of an appeal 'are so clear as to justify expedited action.'" *Id.* (quoting *Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.1980)). The court then granted a summary affirmance, noting that it did so "[b]ecause the Constitution so unambiguously proscribes judicial review of the proceedings that led to the seating of McCloskey," *id.,* and that "further briefing and oral argument . . . would be pointless." *Id.*

In reaching its decision, the court reviewed the history of the constitutional provision. It noted:

The history of the Elections Clause is entirely consistent with its plain exclusion of judicial jurisdiction. In the formative years of the American republic, it was the uniform practice of England and America for legislatures to be the final judges of the elections and qualifications of their members. There was no opposition to the elections Clause in the Federal Constitutional Convention, and the minor opposition in the ratification debates focused upon the clause's removal of final authority not from the *courts,* but from the state legislatures, where the Articles of Confederation had vested an analogous power. It is noteworthy that none of the responses to the opposition mentions the safeguard of judicial review. Such a safeguard was evidently unthinkable, since the determination of the legislative House was *itself* deemed to be a *judicial* one. . . . As far as we are aware, in none of the discussions of the clause did there appear a trace of a suggestion that it conferred was not exclusive and final. The fragments of recorded discussion imply that many took for granted the legislative right of judging of the returns of their members, and viewed it as necessarily and naturally exclusive.

In almost two centuries of numerous election contests resolved by the House and Senate, beginning in the very first Congress, no court, as far as we are aware, has ever undertaken to review the legislative judgment or (until the present litigation) ever been asked to do so.

*Id.* at 447–48 (citations and internal quotation marks omitted). Not only is the rule fundamental, it has been the rule since even before the United States existed.

The Kentucky Senate, like its federal counterpart, "is a legislative body, exercising in connection with the House only the power to make laws. But it has had conferred upon it by the Constitution certain powers, which are not legislative, but judicial, in character. Among these is the power to judge of the elections, returns, and qualifications of its own members." *Barry v. United States ex rel. Cunningham,* 279 U.S. 597, 613, 49 S.Ct. 452, 455, 73 L.Ed. 867 (1929). Section 38 of the Kentucky Constitution, like its federal counterpart—Article I, section 5, of the United States Constitution—places the sole power to make these quasi-judicial

determinations with the relevant house. No doubt, some will object that the federal cases cited herein dealt primarily with the issue of who won the elections in question, and not whether the winner possessed the requisite constitutional qualifications to hold office. But such an objection has no merit. Just as a legislative body has the power to judge the elections and returns of its members, so too does it have the power to judge the qualifications of those members. Each of those questions, which appear in the same constitutional provision, is on equal footing, and the analysis as to each is identical.

In passing on the question of Stephenson's qualifications by adopting the minority report finding her qualified to serve, the Kentucky Senate exercised its constitutionally granted "judicial" power and thus, like the House of Representatives in *Fallahay*, "has made its 'unconditional and final judgment.' " 766 F.2d at 1081.

The rule as to the effect of the decisions of the Jefferson and Franklin Circuit Courts, and the Board of Election's failure to count votes cast for Stephenson, then, is clear: Any other proceeding entertaining questions as to qualifications of a Senator is, at best, complementary to any parallel consideration of the same questions by the constitutionally-mandated arbiter of those questions.[5] And any such complementary

proceeding, whether by an election board or a court, regardless of its outcome, simply cannot bind the Senate when it chooses to engage in an independent determination of these matters. The majority claims that its decision has no binding effect on the Senate in that the injunctions work only to bind Stephenson and to prevent her from assuming the seat. But this claim is illusory, since the injunctions have the practical effect of limiting the Senate's choice as to how it may proceed or who it may choose, all despite the fact that the Senate alone is constitutionally empowered to make that choice.

The objection will also be made that the federal cases involve after-the-fact challenges, whereas the present case involves a pre-election challenge. But if the power to judge the elections, returns, and qualifications are exclusive to the legislative body—and, to be clear, the cases admit no exception—then it stands to reason that no entity has the power to bind the legislative body before the fact. Otherwise, the power granted by Section 38 is meaningless and the provision itself nothing but a dead letter.[6] Again, the necessary rule is clear: Just as a legislative body's decisions about its membership are not reviewable after the fact, so too they cannot be bound before the fact. In short, the legislative

---

5. Even the Franklin Circuit Court refused to find that the Jefferson Circuit Court's order was binding as *res judicata*.

6. This also serves as an answer to Justice Cooper's claim in his separate concurring opinion, where he argues that Woodward actually became a member of the Senate when she took the oath of office as administered by Judge Ryan, thus meaning that the Senate only *"purported* to refuse to seat her as a member of that body." Ante at 177 (emphasis added). If that is the case, the Senate has no opportunity to exercise its power under Section 38, so long as a candidate rushes to the nearest judge and swears the constitution-

al oath. Despite Justice Cooper's implication to the contrary, Section 38 does not become inapplicable simply because a candidate "has been properly certified as duly elected ..., ... has taken the oath of office, and ... possesses the constitutional qualifications for the office." Ante at 177. Furthermore, Justice Cooper's opinion as to the effect of the certification of Woodward as "duly elected" is, like the majority opinion, premised on the mistaken assumption that the official count by the Board of Elections or the certification of the winner by the Secretary of State can bind the Senate if it reexamines the election returns.

body is free to reject any decision on the subject by another body, including one made by a court.

The majority opinion attempts to evade this analysis by limiting the applicability of Section 38 to disputes arising after a person becomes a member of the Senate (or, when applicable, the House), as was the case in *Raney v. Stovall*, 361 S.W.2d 518 (Ky.1962). But such an assertion is against the great weight of authority and reason. The Senate's power under Section 38 is not limited to the narrow circumstances that arose in *Raney*. The vast majority of the cases discussed above contemplate that the power conferred by Section 38, and its federal analog, is plenary and comes into play whenever a legislator elect presents himself or herself to a legislative body for acceptance as a member. Applicability of the Section 38 power does not require that the dispute revolve around someone who is already a member. Rather, it is, at its most basic, the power to close the door and deny entry to a

person claiming the right of membership in the body.[7] How else could a legislative body judge the *elections* of its members? As Justice Story famously observed, the primary function of such a power is to allow the legislative body to determine "who were the legitimately *chosen* members ...." Joseph Story, *Commentaries on the Constitution* § 416, at 295 (Carolina Academic Press 1987) (1833) (reprint of abridgment by the author) (emphasis added). That same power also applies to the determination of the qualifications of incoming members, and just as a legislative house has the power to determine that such an incoming member is unqualified, so too it has the power to determine that such an incoming member is qualified.

Given the clarity with which this concept has been expressed and the consistency with which it has been applied in the federal opinions, I find it mind-boggling, even outrageous, that the majority has deigned to decide these issues.[8] The fun-

7. In making this argument, the majority also attempts to discount any citation to *Raney* and similar cases on the ground that their specific facts make them inapplicable. Though *Raney* addressed the applicability of Section 38 to the power of the legislature to determine the qualifications of its sitting members, prior even to addressing that question, it assumed that Section 38 granted that body the power to determine elections, qualifications, and returns of incoming members. *See Raney*, 361 S.W.2d at 523 ("If the power were limited to the qualifications specified in section 32 thereof, it would be exhausted as soon as the membership of each house was accepted at the beginning of each term."). As such, *Raney* provides further support for the contention that Section 38 gives legislative houses the power to determine the elections, returns, and qualifications of their incoming members.

8. In its conclusion, the majority opinion responds to this specific point by emphasizing this Court's "duty to interpret the Constitution and declare the law." Ante at 174.

Quite simply, my dissent goes to the heart of deciding what the Constitution means in this case. To claim that my interpretation of Section 38 betrays the principles of judicial review as articulated in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), because I would decline to decide the merits of the underlying controversy, is disingenuous. My conclusion that the Constitution requires the Court to stay its hand does not mean that I have somehow shirked my constitutional duty. That the majority implies this while expressly declining to decide the fundamental constitutional questions raised and addressed herein belies this criticism.

It is particularly ironic that the majority has cited to *Marbury* in making this claim. in that case, the Supreme Court, while staking out the contours of judicial review, declined to intervene on behalf of Marbury and held that it lacked jurisdiction to issue the writ that he had requested because the statute granting it jurisdiction to do so was in conflict with Article III, section 2, of the United States Constitution.

damental premise underlying the federal decisions—that a house of the legislature is empowered to determine independently the elections, returns, or qualifications of its members—is the exact opposite of the majority's underlying assumption. Moreover, the federal courts, in interpreting the federal analog of Section 38, have never even considered it a reasonable possibility that a house of the legislature can be bound in its decision by the prior determination of another entity. Section 38 of the Kentucky Constitution admits no different interpretation. As such, I can only conclude that the majority's solution is mistaken. The Senate's power to judge the elections, returns, and qualifications of its members is plenary and without exception. As a result, the wisdom of the Senate's finding that Stephenson was qualified and its resultant decision to seat her as a Senator are beyond our power to review.

## V. The Speech and Debate Clause

Finally, I note that the majority opinion affirms an injunction against a sitting Senator. On January 7, 2005, the Senate found that Stephenson was qualified to serve, and she was seated as a member of the Kentucky Senate. The only injunction in effect at that time ordered the Jefferson Board of Elections not to count any votes for Stephenson. That order was complied with, and, as a result, no votes were reported for Stephenson, the Board of Elections' reports stating instead that votes for her were "suppressed by Court Order." As discussed above, however, that report was not binding on the Senate given its power under Section 38 to independently judge the elections, returns, and qualifications of its members. Therefore, I can only conclude that when the Senate seated Stephenson, she became a member of that body, with all the rights and responsibilities, and privileges and duties incumbent in that office.

Of these privileges, one of the most fundamental is legislative immunity. Section 43 of the Kentucky Constitution provides that "for any speech or debate in either House [the members of the General Assembly] shall not be questioned in any other place." We have read this provision to provide "[a]bsolute immunity ... to legislators in the performance of their legislative functions ...." *Yanero v. Davis,* 65 S.W.3d 510, 518 (Ky.2001). Surely the act of continuing to hold a legislative seat is the quintessence of legislative function. Yet, the Franklin Circuit Court's order, since it was issued on January 14, 2005, *after* Stephenson was seated, had the effect of removing her from her seat in the Senate. Even in *Rose v. Council for Better Education, Inc.,* 790 S.W.2d 186, 203–04, 215 (Ky.1989), the Court declined to allow coercive, i.e., injunctive, relief against the General Assembly. These cases make it clear that the Franklin Circuit Court had no power to prevent Stephenson from maintaining her seat as a member of the Senate or, more generally, from participating in the legislative process as a member of the Kentucky Senate.

Yet, the majority opinion has ratified the use of such coercive injunctive relief against a sitting member of the General Assembly. And with this precedent in hand, no obstacle now exists to prevent any judge in this state from enjoining a member of the General Assembly from voting on a particular act. This may seem an unduly harsh claim, but the simple fact of the matter is that the Jefferson Circuit Court's order had its full effect, and Stephenson was subsequently seated as a member of the Senate. Only after these events did the Franklin Circuit Court enter an injunction that could be considered applicable to Stephenson, and the majority upholds that order. In doing so, they allow an injunction to lie against someone

who had already been seated as a member of the Senate. The existence of such injunctive relief for even a single minute is repugnant to the Constitution.

## VI. Conclusion

The majority opinion blames only the Appellants for the fact that the 37th District has gone unrepresented over the last year, claiming that they should have appealed the order of the Jefferson Circuit Court. But given the nature of the governmental powers involved, once the election began, or at the very least once the Senate acted to seat Stephenson, the onus fell on the courts to decline to decide the questions presented. Unfortunately, the courts have consistently refused to do so over the last year. Moreover, the fact that it has taken over a year to resolve this case is itself ample proof why the Kentucky courts should have declined to entertain *any* action once the election began in November 2004. At the very least, it shows that the courts should have recognized their at most complementary role in this dispute and thus declined to grant injunctive relief against the parties. As then Judge Scalia noted:

> While it is not our role to examine the wisdom of a disposition that appears so clearly in the text and history of the Constitution, we may observe that it makes eminent practical sense. The pressing legislative demands of contemporary government have if anything increased the need for quick, decisive resolution of election controversies. Adding a layer of judicial review, which would undoubtedly be resorted to on a regular basis, would frustrate this end. What is involved, it should be borne in mind, is not judicial resolution of a narrow issue of law, but review of an election recount, with all the fact-finding that that entails, If it be said that the relevant House is not the appropriate

body to make the determination because of the possibility of improper political motivation, the response is that "[a]ll power may be abused if placed in unworthy hands. But it would be difficult ... to point out any other hands in which this power would be more safe, and at the same time equally effectual." *Luther v. Borden,* 48 U.S. (7 How.) 1, 44, 12 L.Ed. 581 (1849). As Justice Story observed:

> If [the power to judge elections is] lodged in any other than the legislative body itself, its independence, its purity, and even its existence and action may be destroyed or put into imminent danger. No other body but itself can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights and sustain the free choice of its constituents.

1 J. STORY [, COMMENTARIES ON THE CONSTITUTIONS] § 833, at 604–05 [ (5th ed.1905) ]. While the party-line votes in the present case (not at all unusual in such disputes) suggest that Justice Story's description of the purifying character of election-judging by the legislature may have been exaggerated, his basic point that institutional incentives make it safer to lodge the function there than anywhere else still stands. The major evil of interference by other branches of government is entirely avoided, while a substantial degree of responsibility is still provided by regular elections, the interim demands of public opinion, and the desire of each House to preserve its standing in relation to the other institutions of government.

*Morgan v. United States,* 801 F.2d 445, 450 (D.C.Cir.1986) (emphasis added). The policy underlying Section 38 is, no doubt, the same. The very reason that Section 38 grants the legislature the exclusive power to judge the elections, returns, and qualifications of its own members is to avoid a prolonged fight over an inherently political question. Alas, this is exactly what has happened here.

For these reasons, I respectfully dissent.

SCOTT, J., joins this dissenting opinion.

SCOTT, Dissenting Justice.

Respectfully, I must dissent. I still firmly believe that Justice Keller was right in his March dissent, when he noted, "because the Kentucky Constitution contains an express separation of powers among the three branches and provides that the Senate itself shall be the sole judge of the qualifications and elections of its members, the Court of Justice, as a whole, lacks jurisdiction in this case." I joined Justice Keller then and after all the ensuing briefs, discussions and arguments, I remain firmly convinced of the correctness of his position.

The campaign for the 37th Senatorial District seat in Jefferson County began with the filing deadline in January, 2004 and ran through the general election on November 2, 2004. The Appellee, Ms. Virginia L. Woodward, (who admitted in the Jefferson Circuit Court hearing that she had been gathering materials on the Appellant, Ms. Dana Seum Stephenson, for months), chose, however, to wait until the last minute of the last day to file a challenge to Ms. Stephenson's qualifications in the Jefferson Circuit Court. With this calculated delay, it was assured there would be no possibility for the action to be resolved prior to the election the next morning.

In fact, the polls had closed, with Ms. Stephenson garnering 22,772 votes to Ms. Woodward's 21,750 votes, when Ms. Stephenson was served with notice of the action at 9:30 p.m., on election night, while attending her victory celebration. Consequently, the hearing could not be held until the day after the election, November 3, 2004 at 3:30 p.m.

At the hearing, the court rejected Ms. Stephenson's motion to postpone the hearing for just a short time, so she might prepare with counsel. Then, after a hearing lasting less than one hour, the Jefferson Circuit Court enjoined the Jefferson County Board of Elections "from certifying the results of the election . . . ." In a final decision on November 22, 2004, the court held Ms. Stephenson did not meet the "residency" requirements set out in Ky. Const. Sec. 32 and permanently enjoined the Jefferson County Board of Elections from counting any votes cast for Ms. Stephenson—even though the tally had already been made.

Then, on December 7, 2004, Ms. Stephenson filed an "Election Contest" with the Kentucky State Senate pursuant to the procedures set forth in KRS 120.195 and 120.215. Ms. Woodward countered with this action in the Franklin Circuit Court on December 15, 2004. Then, on January 7, 2005, after three days of hearings by its Election Contest Committee, the Kentucky Senate received and considered the Contest Committee's reports and recommendations and by a majority vote of the full Senate, rejected the report that recommended seating Ms. Woodward and adopted the report finding Ms. Stephenson did meet the "residency" qualifications of the office and should be seated. Ms. Stephenson was then sworn in and seated as a member of the Kentucky State Senate, representing the 37th Senatorial District in Jefferson County. Thereafter, on Janu-

ary 14, 2005, the Franklin Circuit Court, in this action, granted Ms. Woodward's motion for a temporary injunction against Ms. Stephenson, prohibiting her from exercising any of her duties as Senator from the 37th District.

Because this Court's majority opinion has the effect of extending KRS 118.176 "pre-election" proceedings, not only into areas protected by Section 38 of the Kentucky Constitution, but even past the general election deadline, it may be expected that the "calculated late filing" as occurred here, will be replicated many times over in the years to come, at a cost of increased rancor between the political parties, and hundreds of thousands of dollars of additional expenditures for new elections by the various candidates and taxpayers of this state. More importantly, during these "now extended contests," their constituencies will be without representation in the important functions of government, due to the delays naturally inherent in litigation.

As I write today, we are in late December and during all of this time, Jefferson County has been without the aid of one of its Senators through the making of the budget in 2005 and will, more likely than not, be without one of its Senators during the session in 2006. Thus, only the most partisan constituents of the electorate could have enjoyed this battle.

Section 27 of the Kentucky Constitution provides that, "[t]he powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body ...: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Section 28 of the Kentucky Constitution provides, "no person or

collection of persons, being one of those departments, **shall exercise any power properly belonging to either of the others,** except in the instances hereinafter expressly directed or permitted." (Emphasis added). **Section 38 of the Kentucky Constitution then provides, "each house of the General Assembly shall judge of the qualifications, elections and returns of its members, but a contested election shall be determined in such manner as shall be directed by law."** [1] (Emphasis added). Thus, when dealing with the qualifications, elections and returns of members of the General Assembly, Section 38 authorizes only "contested elections" to be determined according to law—it grants no ground for interference by "pre-election proceedings."

"Properly speaking, an election cannot be 'contested' before it is held and thus 'an election contest is a post-election proceeding.'" *Thomas v. Lyons,* 586 S.W.2d 711, 715 (Ky.1979). Election contests are regulated by KRS Chapter 120. And as to the Governor, the Lieutenant Governor and members of the General Assembly, such contests are specifically authorized by Ky. Const. Sec. 38 and 90. "Pre-election proceedings" are regulated by KRS Chapter 118 and are not an approved means of determining the "qualifications, elections, and returns" of the members of the General Assembly under Ky. Const. Sec. 38.

KRS 118.176 falls within Chapter 118, titled "Conduct of Elections," whereas, KRS 120.215 falls within the Chapter appropriately titled "Election Contests." "What we have in this case is not an election contest, but a pre-election proceeding ...." *Thomas* at 715. **Moreover, we recognized in *Thomas,* that when**

---

1. There are no other relevant constitutional sections, other than Section 90, which I will address momentarily.

KRS 118.176 "runs athwart" of constitutional sections, KRS 118.176 must give way. *Thomas* at 716.

KRS 118.176, dealing with "pre-election" procedures, provides, in relevant part:

(1) A "bona fide" **candidate** means one who is **seeking nomination** in a primary or election in a general election
. . . .

(2) The bona fides of any candidate seeking nomination or election in a primary or general election may be questioned by any . . . voter entitled to vote for such candidate or by an opposing candidate by summary proceedings consisting of a motion before the Circuit Court . . . . An action regarding **the bona fides of any candidate seeking nomination or election** . . . may be commenced at any time **prior to the general election.** The motion shall be tried summarily and without delay. . . . (Emphasis added).

. . . .

(4) . . . The order of the Circuit Court shall be . . . subject to a motion to set aside in the Court of Appeals. The motion shall be heard by the Court of Appeals or a judge thereof . . ., except that the motion must be made . . . within five (5) days . . ., and the order of the Court of Appeals or judge thereof shall be final. . . .

KRS Chapter 120, however, sets out the rules for "Election Contests." KRS 120.155 sets the stage and provides, in relevant part:

Any candidate for election to any state, county, district or city office (**except the office of Governor, Lieutenant Governor, member of the General Assembly,** . . .), . . . may contest the election of the successful candidate, by filing a petition in the Circuit Court . . . . (Emphasis added).

KRS 120.205 points out, in relevant part:

When the election of a Governor or Lieutenant Governor is contested, a board for determining the contest shall be formed [from the General Assembly] . . . .

. . . .

(5) . . . The decision of the board shall not be final nor conclusive, but shall be reported to the two (2) houses of the General Assembly, in joint session, for the further action of the General Assembly. . . . .

KRS 120.215 then, for members of the General Assembly, provides:

When the election of a member of the General Assembly is contested, the branch to which he belongs shall, within three (3) days after its organization, and in the manner provided in *KRS 120.205*, select a board of not more than nine (9) nor less than five (5) of its members to determine the contest. Such board shall be governed by the same rules, have the same power, and be subject to the same penalties as a board to determine the contested election of Governor. It shall report its decision to the branch of the General Assembly by which it was appointed, for its further action.

As indicated, the Kentucky Senate met on January 7, 2005 and by a majority vote rejected the Contest Committee's majority report, which found Ms. Stephenson had not met residency requirements, but then accepted the Committee's minority report, which concluded Ms. Stephenson had met the residency requirements. It is the disagreement over the constitutional meaning of "residence" under Section 32 of the Kentucky Constitution which has fueled this Court's invasion of the powers granted the General Assembly under Section 38.

But the central point, which is more eloquently addressed in Justice Keller's March dissent and in Justice Roach's dissenting opinion, is the fact that the founders of our Constitution did not give us (only one of the three branches of the government) the power to interfere with "the qualifications, elections and returns" of our sister branch, the General Assembly.

"Although current policy may differ from that of another time, the intent of the framers of the Constitution and of the people adopting it must be given effect." *City of Ashland v. Calvary Episcopal Church of Ashland,* 278 S.W.2d 708, 710 (Ky.1955). Thus, the Constitution continues to mean what it meant when it was adopted. *Runyon v. Smith,* 308 Ky. 73, 212 S.W.2d 521, 524 (1948). "Courts in construing constitutional provisions will look to the history of the times and the state of existing things to ascertain the intention of the framers of the Constitution and the people adopting it . . . ." *Shamburger v. Duncan,* 253 S.W.2d 388, 390, 391 (Ky.1952); *see also Keck v. Manning,* 313 Ky. 433, 231 S.W.2d 604, 607 (1950).

A perusal of the official report of the proceedings and debates in the Constitutional Convention, held in Frankfort in September of 1890, offers some insight. Therein, the honorable delegate from Pendleton county, Mr. Leslie T. Applegate, pointed out to those assembled:

> Because the experience of time has shown that along in 1849 or in 1850, or even going back to 1792, [the words] didn't mean what the men who used them thought they meant; and while I have the profoundest respect for our courts, yet they have turned their forces upon it, and they have turned the light of reason upon it, and we have found that these expressions are deficient to protect men and their private rights, and for that reason we have enlarged upon the expressions here . . . . If you can ever use language so plain and specific that the courts will not sometime or another make a change in it, then I would like you to employ it, because this morning I sat down in the library and took down Barbour's Digest and found that the court has overruled itself more than a hundred times in its history; then if they themselves cannot say what they mean and stick to it, how in the name of heaven can we use any language that will always be construed as we wish it and which they will stick to. *Debates, Constitutional Convention* 1890 Ky. Vol. I, P. 590, 591.

The honorable Delegate from Todd County, Mr. H.G. Petrie, pointed out:

> [I]n thinking about it, it occurred to me that these judges who are giving this satisfactory interpretation of that clause of the Constitution will in a few years pass away from the honored seats they now occupy, and those seats will be filled by other judges. It will be, as it was said by the Delegate from Pendleton, the same court but different judges. Who knows how they may view that section? They may conclude that the interpretation of the present judges is wrong. They may be unable to concur. They may say that the construction given that clause by some of the other judges way back yonder was the correct one; and then we would have the trouble again; so it seems to me if human language can be so arraigned as to express really the thought intended to be conveyed . . ., then it ought to be done. *Id.* at 625. (Emphasis added).

Looking further at the disagreement we have, within its historical context, the seminal case, *Taylor v. Beckham,* 108 Ky. 278, 56 S.W. 177 (1900), decided only nine years after the adoption of our current Constitu-

tion. Interestingly enough, Sen. William Goebel, a sad focus of the case, was an outspoken convention member in the 1890 convention. In fact, the episode which furnished the basis for *Taylor* is often referred to as the "Goebel affair."

> The 'Goebel affair' was the most disturbing episode in Kentucky's political history. It left the state's electorate in a highly embittered frame of mind. The Republicans said, 'they stole the election,' and the Democrats answered, 'they shot our Governor [Goebel].' It matters little to posterity who fired the shot that killed Senator Goebel; the important fact is that it forced Kentucky into a long period of partisan and factional war which prevented passage of much needed progressive legislation. Thomas D. Clark, *A History of Kentucky,* p. 442.[2]

In *Taylor,* the Republican gubernatorial nominee, W.S. Taylor, received a majority of 2,383 votes over the Democrat nominee, William Goebel. The Republican Lieutenant Governor nominee, John Marshall, had a somewhat larger majority over the Democrat nominee, J.C. Beckham.

> The final official count gave Taylor a majority, and this was the signal for Democrats to start challenging votes. It was claimed [Republican] Governor Bradley's troops had prevented an honest election in Louisville. Most outrageous of all, however, was the fact that by political chicanery or 'oversight,' votes of many eastern Kentucky Republican counties were registered upon 'tissue paper' ballots, which, it was claimed,

were not printed on legal weight paper. This charge, a fine piece of Kentucky political chicanery, was trumped up to throw out the election. Thomas D. Clark, *A History of Kentucky,* p. 439.

Notwithstanding the political wrangling, on December 12, 1899, Taylor was sworn in as Governor. An Election Contest was then filed by Goebel and Marshall, placing the "election contest" in the Democrat dominated General Assembly, pursuant to Section 90 of the Kentucky Constitution.

Section 90, similar to Section 38, provides, "contested elections for Governor and Lieutenant Governor shall be determined by both houses of the General Assembly, according to such regulations as may be established by law." The law pursuant to this Section at the time was Ky. St., Sec. 1596(a)(8), which is a predecessor of today's KRS 120.205. The General Assembly then determined that William Goebel was the winner over Taylor for Governor and that J.C. Beckham was the winner for Lieutenant Governor over Marshall. Taylor then filed suit to set aside the actions of the General Assembly. By that time however, Senator Goebel had been shot as he tried to enter the Capitol building. He died from the wound on February 3, 1900.

In *Taylor,* Justice Burnam set out the circumstances of the case our predecessor, then the Kentucky Court of Appeals, was faced with:

> The general demurrer ..., admits that ... Williams S. Taylor and John Marshall had received the highest number of

---

2. Caleb Powers, the then Republican Secretary of State was tried four times for his part in Goebel's murder, along with Henry Youtesy, a clerk in his office. Three times Powers was sentenced to life in prison, once to be hanged. Each time his conviction was reversed by our predecessor, the old Court of Appeals. Finally, he was pardoned by Governor Augustus E. Willson. Youtesy, was par-

doned by Governor A.O. Stanley. The Powers reversals make interesting reading and may be found in *Powers v. Commonwealth,* 110 Ky. 386, 61 S.W. 735 (Ky.1901); *Powers v. Commonwealth,* 114 Ky. 237, 70 S.W. 1050 (Ky. 1902); *Powers v. Commonwealth,* 114 Ky. 237, 71 S.W. 494 (Ky.1903) and *Powers v. Commonwealth,* 139 Ky. 815, 83 S.W. 146 (Ky.1904).

votes given for the offices of governor and lieutenant governor . . .; that at the election, . . . the entire election machinery of the state was in the hands of the friends and partisans of contestants [Goebel and Beckham] . . .; that the members of the state board of election[s] . . . were themselves fellow partisans of contestants; that by the action of the election officers on the day of the election contestees [Taylor and Marshall] were illegally, . . . deprived of a large number of votes in the various voting precincts of the state; that, subsequent to the election, contestants had entered into a conspiracy with diverse members of the legislature to nullify this election of the people by the institution of a fraudulent contest before them; that, pursuant to this conspiracy so entered into, the contest boards were selected by a fraudulent device . . . that as a result of this trick 10 out of the 11 members selected for the trial of the governor's contest were partisans of the contestant, . . . that at least one member of the board selected to try the contest for the office of Governor had wagered money on the result of the election; that the contest boards, in the trial of the contests had acted throughout in an illegal, tyrannical, and arbitrary manner in the admission and rejection of testimony, and in the whole conduct of the trial; that they did not report to the general assembly any of the testimony which had been taken upon the trial; and that the general assembly, at the time they approved the decisions of the contest boards, did not have a particle of testimony before them, were not familiar with the facts, refused to hear argument, held their alleged meeting at which the contests were determined at a secret place without the knowledge of either contestees, or more than one-third of the entire membership of the general assembly, who were thereby excluded from any participation in the action . . . . *Taylor* at 184, 185 (concurring opinion by Justice Burnam).

In fact, Justice Burnam was so thoroughly disgusted with the events, that he went on to state:

It is hard to imagine a more flagrant and partisan disregard of the modes of procedure which should govern a judicial tribunal in the determination of a great and important issue than is **made manifest by the facts alleged and relied on by contestees, and admitted by the demurrer filed in this action to be true;** and I am firmly convinced, both from these admitted facts and from knowledge of the current history of these transactions, that the general assembly, in the heat of anger, engendered by the intense partisan excitement, which was at that time prevailing, have done two faithful, conscientious, able public servants an irreparable injury in depriving them of the offices to which they were elected by the people of this commonwealth; and a still greater wrong has been done a large majority of the electors of this commonwealth who voted under difficult circumstances to elect these gentlemen to act as their servants in the discharge of the duties of these great offices. *Taylor* at 185. (Concurring opinion by Burnam, J.). (Emphasis added).

Yet, the court in *Taylor*, just nine years after the adoption of our current Constitution, with Justice Burnam concurring, recognized the necessary limitations which had been placed on us by the Kentucky Constitution, to-wit:

although it sometimes has been urged at the bar that the court ought to inquire into the motives of the legislature where fraud and corruption were alleged, and annul their action if the allegations were

established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon. The reasons are the same here as those which preclude an inquiry into the motives of the governor in the exercise of a discretion vested in him exclusively. He is responsible for his acts in such a case, not to the court, but to the people. *Taylor* at 180.

The powers of the three departments are not merely equal. They are exclusive in respect to the duties assigned to each. They are absolutely independent of each other. It is now proposed that one of the three powers shall institute an inquiry into the conduct of another department and form an issue to try by what motives the legislators were governed in the enactment of a law. If this may be done, we may also inquire by what motives the executive is induced to approve a bill or withhold his approval, and, in case of withholding it corruptly, by our mandate compel its approval. To institute the proposed inquiry would be a direct attack upon the independence of the legislature, and a usurpation of power subversive of the constitution. *Id.* We cannot hesitate a moment on this question. We have no such authority, and ought not to have. However far the legislature may depart from the right line of constitutional morality, we have no authority to supervise and correct their act on the mere ground of fraudulent or dishonest motives. We know of no such check upon legislation, and would not desire to see such a one instituted. **The remedy for such an evil is in the hands of the people alone, to be worked out by an increased care to elect representatives that are honest and capable.** If the judiciary have such authority, then every justice ... is competent to sit in judgment upon every act of legislation which disorderly moralists or knavish or ignorant anarchists may choose to charge as fraudulent. Nay, more, if the question may be raised in a judicial proceeding, the judges and justices ... will be bound to investigate and decide it, and the principal judicial business then might become that of testing, not cases by the standard of the law, but the standard itself by the infinitely various and uncertain judicial notions of morality. *Taylor* at 181. (Emphasis added).

Public authority and political power must, of necessity, be confided to officers, who, being human, may violate the trust reposed in them. This perhaps cannot be avoided absolutely, but it applies also to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments, and correct or prevent abuses of their authority.... That power does not belong to it. Nor can it keep the legislative journal .... It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim the judiciary only will be faithful to its obligation. *Taylor* at 182–183, citing *Evans v. Browne*, 30 Ind. 514, 1869 WL 3177 (Ind.), 95 Am. Dec. 710 (1869).

The determination of the result of an election is purely a political question, and, if such suits as this may be maintained, the greatest disorder will result in the public business. It has always been the policy of our law to provide a summary process for the settlement of such contests, to the end that public business shall not be interrupted; but, if such a suit as this may be maintained,

were will such a contest end? **To illustrate, section 38 of the state constitution provides: 'Each house of the general assembly shall judge of the qualifications, elections and returns of its members, but a contested election shall be determined in such manner as shall be directed by law.' Whatever inherit power either house might have had to determine the election of its members if the constitution had been silent, its power under this section is limited to the grant. It will be observed that the phraseology is substantially the same as section 90, relating to contested elections of governor and lieutenant governor.** Suppose these suits had been brought by two members of the general assembly, alleging, in effect, the same facts that are alleged in this case, would anybody suppose the judiciary of the state would have the power to go behind the legislative journals, or to supervise the propriety of the legislative action, in determining the election of its members? *Taylor* at 183–184. (Emphasis added). It is earnestly argued that the general assembly was wrong in its decision of this case, and that it is a very serious matter thus to overthrow the will of the people. Whether the Assembly was right or not in its decision, it is not our province to determine. But a much more important question is involved in the case, which is the integrity of our form of government as founded by our forefathers. If the action of the legislature may be disregarded by the courts, then it is no longer an equal and independent branch of the government within its constitutional jurisdiction, but the courts become the final depository of the supreme power of the sate. Judicial tyranny is no less tyranny because couched in the forms of law. There was a great wisdom in dividing the powers of

a republic between three equal and independent sets of officers. One operates as a check upon the other, and no greater blow to the perpetuity of our institutions could be given than to destroy this check. *Taylor* at 184.

The strictures set out in *Taylor* are not archaic or ancient; they are as valid today as they were nine years after our Constitution was adopted. "As observed by the legislature, state courts have consistently concluded that a constitutional provision providing that the legislature 'shall judge' the qualification, returns and elections of its own members insulates a legislator's qualification to hold office from judicial review. In other words, a legislative body's decision to admit or expel a member is almost un-reviewable in the courts. *Heller v. The Legislature of the State of Nevada,* 120 Nev. 456, 93 P.3d 746, 753 (2004).

Those of us dissenting are not alone in this view. *See Foster v. Harden,* 536 So.2d 905, 906 (Miss.1988) (refusing to consider an election contest which questioned whether a state senator satisfied a residency requirement, because: "Section 38 of the [Mississippi] Constitution provides in unambiguous language that each house of the legislature 'shall judge of the qualifications, return and election of its own members.' The almost universal constitutional doctrine in the United States and the several states which have constitutions containing this or similar provisions is that: Each legislative body is the sole judge of the elections, returns, and qualifications of its own members, and its action in admitting or expelling a member is not reviewable in the courts."); *State ex rel. Turner v. Scott,* 269 N.W.2d 828 (Iowa 1978) (characterizing as a non-justifiable controversy a *quo warranto* action to remove a Senator who allegedly failed to satisfy the states inhabitancy requirement); *Buskey v.*

*Amos,* 294 Ala. 1, 310 So.2d 468 (1975) (holding that appellate court lost jurisdiction to consider candidate's residency when the candidate was sworn in to the Alabama Senate); *State v. Banks,* 454 S.W.2d 498, 500–01 (Mo.1970) (declining to consider a *quo warranto* action to oust a state legislator, stating that no authority existed to contradict the principle that a legislatures power to judge its members qualification is exclusive); *Raney v. Stovall;* 361 S.W.2d 518 (Ky.1962) (refusing to question the Kentucky Senate's approval of a deputy sheriff also serving as a Senator); *State v. Wheatley,* 197 Ark. 997, 125 S.W.2d 101(1939) (refusing to consider whether the state legislator was disqualified from service based on his conviction for an infamous crime); *Lessard v. Snell,* 155 Ore. 293, 63 P.2d 893 (1937) (declining to question the qualifications of a state senator who had been commissioned as a Notary Public and employed as a County Attorney, the court held: "we apprehend there is no case in the books—certainly none cited—where any court has ever ousted a member of a legislature or directed such a co-ordinate branch of government to accept any person as one of its members."); *State v. Cutts,* 53 Mont. 300 163 P. 470 (1917) (declining to consider *quo warranto* challenge to legislators right to sit in the Montana House of Representatives).

Even Judge Graham of the Franklin Circuit Court, whose decision this Court is upholding (albeit for different reasons), conceded that this is an accurate representation of the law in this regard, "we agree with Stephenson and Williams that Section 38 does not strictly limit the rights of the Senate to pass upon the qualifications of its members. Although Woodward vehemently disagrees with this proposition Kentucky case law has consistently ruled to that effect." *Woodward v. Stephenson, et al.,* No. 04–CI–1676, slip op. at 11 (Franklin Cir. Ct. June 1, 2005) (order granting permanent injunction).

It is obvious, that a power must be lodged somewhere to judge of the election, returns, and qualifications of the members .... The only possible question on such a subject is, as to the body, in which such a power shall be lodged. If lodged in any other, than the legislative body itself, its independence, its purity ... may be destroyed .... No other body, but itself, could have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard it own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of it own constituents. Accordingly, the power has always been lodged in the legislative body by the uniform practice of England and America. *Scheibel v. Pavlak,* 282 N.W.2d 843, 847 (Minn. 1979) (quoting Story, *Commentaries on the Constitution* § 416 (Abr. Ed. 1833), cited in Legislation, *The Legislators Power to Judge the Qualifications of its Members,* Vand. L.Rev. 1410, 1412 (1966)).

Although the majority can cite many cases where elected officials have been denied office after having won the majority of the votes in an election, they cannot cite one case where the courts have ruled against the "qualifications, elections, and returns" of a member of a General Assembly, whose qualifications, election and returns have been accepted by a body of the Assembly, from any jurisdiction that has constitutional provisions comparable to Sections 27, 28 and 38 of the Kentucky Constitution.

What the majority has done, however, is to construct artful logic from which they

now announce that the General Assembly, by its 2001 Amendment to KRS 118.176, intended to, **and did authorize**, the courts to intervene in decisions dealing with the "qualifications, elections, and returns" of members of the General Assembly. They do this under the guise of a perceived legislative over-reaction to the August 16, 2000 Court of Appeals decision in *Legate v. Stone.*[3]

Legate was the successful candidate for the Democratic nomination for city councilman in Madisonville, Kentucky. The problem was—he was a registered Republican. After the primary election, Rudy Stone, the unsuccessful candidate, filed a challenge to Legate's qualifications on this basis. The Circuit Court then granted relief and declared the primary nomination vacant In reversing the trial court, and allowing Legate, the Republican, to run as the Democrat nominee, the Court of Appeals relied on our long-standing rule in *Noble v. Meagher*, 686 S.W.2d 458 (Ky. 1985) (involving the qualifications of judges), where we noted, in reference to KRS 118.176, "**it is our further holding that challenges to the qualifications of candidates to appear on the ballot must be made before the primary election.**" (Emphasis added). Thus, the General Assembly in 2001, amended KRS 118.176 by adding the additional language that "an action regarding the "bona fides" of any candidate seeking nomination or election in a primary or general election may be commenced at any time prior to the general election."

From a legislative amendment crafted to avoid the strictures of *Legate* (concerning only a city councilman), the majority of this Court, now concludes,

from this history, we believe that it is unquestionable that the General Assembly amended KRS 118.176 in 2001 to effectuate a singular goal: to allow challenges to a candidate's qualifications after the primary election and at any time prior to the general election. Finding no ambiguity in the plain language of the statute, it is our holding that KRS 118.176 permits a Circuit Court to consider and adjudicate [after election] challenges to a candidate's bona fides that are commenced prior to the general election. There are no limitations placed on the movant [Ms. Woodward] as to how far in advance of the election the action may be commenced, nor are there limitations placed on the Circuit Court concerning time limitations for adjudication. Here, Woodward commenced her action prior to the general election. That she filed the Motion to Disqualify Stephenson hours before the polls opened is of absolutely no consequence; her action was commenced prior to the election and satisfies the simple requirement of the statute.

[Opinion, p. 173].

This logic ignores the fact that in *Legate*, the challenge was filed after the primary, but in plenty of time to complete the "summary proceeding and appeals" referenced in KRS 118.176, prior to the general election. In fact, the Court of Appeals opinion in *Legate* was entered on August 16, 2000 and we denied discretionary review on August 24, 2000. Thus, all the General Assembly intended to do with this amendment was to allow its filing after the primary and that's the extent of their meaning by "may be commenced at any time prior to the General Election." **In no sense, should we have ever presumed**

---

**3.** As noted in the majority opinion, this case was unreported, but may be referenced by its case number 2000–CA–01724–1.

from this change that the General Assembly meant to let us interfere in their political realm, a realm which has not been violated since 1792—the date of our first Constitution.

The majority arrives at this logic, notwithstanding the comments of the Representatives concerning this amendment during the session of the House Committee on Elections, Constitutional Amendments and Intergovernmental Affairs, which, in explaining the amendment, acknowledged that, after an election, candidates "are no longer candidates" and therefore cannot be the subject of KRS 118.176 actions.

There is no question but that the majority of this Court, by virtue of their construction of the intention of the legislature in regards to the 2001 amendment, can constitutionally consider and hold that the time within which "pre-election" litigation may endure has been extended in cases such as *Legate* (a city commissioner) and *Meagher* (a judge) by the 2001 amendment. As long as they recognize that last minute filings on the last day, with all the consequent disruptions and later expenses (from overturned elections), will be the rule of the future. I could concur in a decision of such tenor. But I cannot concur with a decision that extends KRS 118.176 into constitutionally impermissible areas, such as Ky. Const. Sec. 38.

Never before has this Court hesitated in finding the application of KRS 118.176 to be unconstitutional when it invades constitutionally protected areas. "To the extent that KRS 118.176(4) provides that the action of the Court of Appeals shall be final [, it] runs athwart Const. Sec. 110(2)(b), which authorizes the Supreme Court to exercise appellate jurisdiction as provided by its rules." *Thomas v. Lyons,* 586 S.W.2d 711, 716 (Ky.1979). (Emphasis added). Remember, KRS 118.176(4) expressly limits appeals from the Circuit Court to the Court of Appeals and states their orders shall be final. In *Thomas,* we held that was unconstitutional as intruding into our constitutional powers. Thus, this Court should respect its own precedents and protect the powers of our sister branches of government when their constitutional powers are invaded by KRS 118.176, as we do our own. This is a responsibility we have neglected in this case.

In summary, I acknowledge the validity of the majority's ruling extending the litigation time pursuant to KRS 118.176 for all contestants, other than the Governor, the Lieutenant Governor, and the members of the General Assembly, who have constitutional protections, which 118.176 cannot penetrate. But I do not recognize that we can invade a sister branch of government's constitutional power under any guise. Therefore, I believe the acts of the majority of this Court, in this decision, are unconstitutional, as outside the powers granted us. *Cf. Taylor.* And in doing so, they are as wrong as was the Senate.

But I must go further. The lengthy existence of this Nation and of all its states is great evidence that our forefathers, who constructed our constitutions, knew how to build a great government, a structure you might say, which would withstand the winds and storms of history. The one secret they knew, and we overlook today, is that they built this government, or structure, on a solid foundation—the people. They recognized the people and relied upon them, to be the fourth player in government, to be more effective, for their own interests, more diligent and timely, than government itself. For these reasons, each of our three branches of government were intentionally hampered in some areas, so that they would all remain equal; so no one branch, could ever become greater than the others, could ever garner

enough power, to overcome the greatest part of government—the people. This government, or structure, they built, consists of 264 parts, or sections (the Constitution), and when you change one of these sections, you change the whole structure. Maybe just a little today, but that change will grow in time and then someday, you will find, to your dismay, that the whole structure has changed.

And let's step back and compare the resolution of this issue, the way the founders of our Constitution intended it to be resolved, with the way the court system has resolved it to date. Had this Court followed its own precedent in *Taylor*, the 37th Senatorial District of Jefferson County would have had a Senator to participate in the budget and other decisions of 2005. It would have a Senator to participate in the budget and legislative decisions to be made in 2006. And in a normal year, that great fourth part of government—the base of government—the people—would have expressed their political voice and vote in November, punishing the party they found at fault and rendering any further discussion of the matter unnecessary.

Yet, in our actions to date, we have upheld two Circuit Court opinions which admit they cannot grant Ms. Woodward's request to be seated as the Senator for the 37th Judicial district; cannot grant her request to face the President of the Senate, David Williams, or the Senate, to seat Ms. Woodward; and cannot make the Senate call for a special election to fill the seat. If one does not recognize that this means we were not meant to have this power, then I can not point it out any better.

All the Circuit Court order does, is declare Ms. Stephenson to be unqualified and enjoin her from "sitting as the State Senator, from performing any official duties of the office of State Senators; from receiving or accepting any pay for the office of State Senator, and from participating in the affairs of the General Assembly, including, but not limited to, participation of committee meetings, hearing, any votes, as well as, meetings, hearing, and votes of the full body senate." Thus, by this opinion we have already acknowledged that we have no power to coerce the Kentucky State Senate, if it chooses to ignore this opinion.

Moreover, if the Appellant, Ms. Stephenson, disregards the injunction, then we will again be called upon to decide whether or not the contempt powers of the Courts to enforce an injunction would themselves, be in violation of Section 43 of the Kentucky Constitution, which states, "the members of the General Assembly shall, in all cases except treason, felony, or breach or surety of the peace, be privileged from arrest during their attendance of the sessions of their respective houses, and going to and returning from the same; and for any speech or debate in either house they shall not be questioned in any other place." Ky. Const., Sec. 43. "**[Legislative] immunity not only applies to speech and debate, but to voting, reporting, and every act and execution of their legislative duties while in either house.**" *Wiggins v. Stuart*, 671 S.W.2d 262, 264 (Ky.App.1984) citing *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

This is the question left for another day. But it still bears out one point. The resolution of this political question would have been resolved much better at the ballot box, rather than in the courtroom. And we are all in this situation because the majority has chosen to condone the calculated late filing of this type of "pre-election proceeding" in a manner that precluded any effective court process until after the election—thus rendering it an "Election Con-

test" and putting it in conflict with Ky. Const. § 38.

Constitutional Convention delegate, Mr. Charles J. Bronston, of Fayette County, noted on the floor at the 1890 convention, that, "we will not submit to the fluctuations of the future. Majorities might arise that would undertake to infringe upon these liberties which we seek to secure and therefore, we will not submit them to the rule of the majority." What he was alluding to was the fact that the protections built into the Constitution are to be honored by us and our posterity, as they were written, until we properly amend the Constitution, or call a convention to adopt a new one. I admit that it is much easier, simpler, and quicker to amend the Kentucky Constitution by a majority vote of this Court. But that does not make it right. In fact, it is as wrong as what the Senate did.

When all is said and done, few will acknowledge that I stood up for Kentucky and its Constitution, rather than for Ms. Stephenson or Ms. Woodward. But I did.

Having said all I can say in defense of our Constitution, I close in dissent.